DAVID L. NEALE (SBN 141225)
LINDSEY L. SMITH (SBN 265401)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  dln@lnbyb.com, lls@lnbyb.com

Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### NORTHERN DIVISION

| | |
|---|---|
| In re | Case No.: 9:15-bk-10477-DS |
| MALIBU ASSOCIATES, LLC, | Chapter 11 |
| Debtor. | **NOTICE OF MOTION AND MOTION FOR ORDER ESTABLISHING BIDDING PROCEDURES FOR SALE OF DEBTOR'S PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO 11 U.S.C. §§ 105 AND 363; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF THOMAS C. HIX IN SUPPORT THEREOF** |

Hearing:
Date:    September 21, 2015
Time:    10:30 a.m.
Place:   Courtroom "202"
         1415 State Street
         Santa Barbara, California 93101

1

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES …………………………………. 4

I.    STATEMENT OF FACTS …………………………………………………….. 4

    A.    Background And Events Leading to Bankruptcy Filing …………………. 4

    B.    Significant Events During The Debtor's Bankruptcy Case ……………… 7

    C.    The Stalking Horse APA ………………………………………………. 9

II.    PROPOSED BIDDING PROCEDURES ………………………………………… 9

III.    DISCUSSION …………………………………………………………………….. 17

IV.    CONCLUSION …………………………………………………………………… 22

DECLARATION OF THOMAS C. HIX ………………………………………………. 23

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

4                                             <small>CASES</small>

5    <u>Beebe v. Pacific Realty Trust</u>
        578 F.Supp. 1128 (D. Or. 1984) -------------------------------------------------------------20
6
    <u>Cottle v. Storer Communication</u>
7        849 F.2d 570 (11th Cir.1988) ------------------------------------------------------- 19, 20

8    <u>CRTF Corp. v. Federated Dept. Stores</u>
        683 F. Supp. 422 (S.D.N.Y.1988) ---------------------------------------------------------20
9
    <u>Doehring v. Crown Corp. (In re Crown Corporation)</u>
10        679 F.2d 774 (9th Cir. 1982) ------------------------------------------------------------17

11   <u>In re 995 Fifth Ave. Assoc., L.P.</u>
        96 B.R. 24 (Bankr.S.D.N.Y.1989)------------------------------------------------------ 19, 21
12
    <u>In re 995 Fifth Avenue Associates, L.P.</u>
13        96 B.R. 24 (Bankr. S.D.N.Y. 1989) ------------------------------------------------------20

14   <u>In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.</u>
        115 B.R. 34 (Bankr. S.D.N.Y. 1990)-------------------------------------------------------18
15
    <u>In re Atlanta Packaging Products, Inc.</u>
16        99 B.R. 124 (Bankr. N.D. Ga. 1988) ------------------------------------------------------17

17   <u>In re Crowthers McCall Pattern, Inc.</u>
        114 B.R. 877 (Bankr. S.D.N.Y. 1990) -------------------------------------------------- 18, 20
18
    <u>In re Financial News Network, Inc.</u>
19        126 B.R. 152 n.5 (Bankr.S.D.N.Y.1991);----------------------------------------------------19

20   <u>In re Integrated Resources, Inc.</u>
        147 B.R. 650 (S.D.N.Y.1992)-------------------------------------------------------- 19, 20, 21
21
    <u>In re S.N.A. Nut Co.</u>
22        186 B.R. 98 (Bankr.N.D.Ill 1995) ---------------------------------------------------------19

23   <u>In re T.V.S.I. Holdings</u>
        90 B. 13581-13586, 90 B 13856-13864 (Slip Op.) (Bankr.S.D.N.Y. 1991) --------------------20
24
    <u>Samjens Partners I v. Burlington Indus.</u>
25        663 F.Supp. 614 (S.D.N.Y. 1987) ---------------------------------------------------------20

26

27

28

# **TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

### STATUTES

11 U.S.C. § 105 ------------------------------------------------------------------------ 2, 7, 23, 27
11 U.S.C. § 361 ------------------------------------------------------------------------------- 7, 27
11 U.S.C. § 363 -------------------------------------------------------------------------------2, 17
11 U.S.C. § 364(c) -----------------------------------------------------------------------------7, 27
11 U.S.C. § 364(c)(3)--------------------------------------------------------------------------7, 27
11 U.S.C. § 364(d)(1) --------------------------------------------------------------------------7, 27
11 U.S.C. § 364(e) -----------------------------------------------------------------------------7, 27
11 U.S.C. § 1107------------------------------------------------------------------------------4, 23
11 U.S.C. § 1108------------------------------------------------------------------------------4, 23

### RULES

Fed. R. Bankr. Proc. 6004(f) ---------------------------------------------------------------------17
Fed.R.Civ.P. 4001(c) --------------------------------------------------------------------------7, 27
L.B.R. 9013-1(h)-------------------------------------------------------------------------------- 3

**PLEASE TAKE NOTICE** that a hearing will be held on September 21, 2015, at 10:30 a.m., before the Honorable Deborah J. Saltzman, United States Bankruptcy Judge, in Courtroom "202" in the United States Bankruptcy Court located at 1415 State Street, Santa Barbara, California 93101, for the Court to consider the motion filed by Malibu Associates, LLC, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), for an order establishing bidding procedures (the "Bidding Procedures") for the sale of the Debtor's real property commonly known as the "Malibu Country Club", consisting of 650.98 acres of land and located at 901 Encinal Canyon Road, Malibu, California 90265 (the "Property"), free and clear of all liens, claims, encumbrances and other interests pursuant to 11 U.S.C. §§ 105 and 363 and Local Bankruptcy Rule 6004-1(b) (the "Motion").  The complete bases of the Motion are set forth in the Memorandum of Points and Authorities annexed hereto.

The Debtor has entered into a Purchase and Sale Agreement (the "Stalking Horse APA") with Brixton Capital AC, LLC, a Delaware limited liability company (the "Stalking Horse") for the sale of the Property for $35 million (the "Purchase Price"). The sale of the Property pursuant to the Stalking Horse APA is subject to overbid and auction on the terms set forth in the Stalking Horse APA. Specifically, Section 3 of the Stalking Horse APA sets forth the Bidding Procedures for the sale of the Property, of which the Debtor seeks approval pursuant to this Motion.  A true and correct copy of the Stalking Horse APA is attached to the Declaration of Thomas C. Hix annexed hereto as **Exhibit "1"** and is incorporated herein by reference. The complete bases of the Motion and the details of the Bidding Procedures are set forth in the Memorandum of Points and Authorities annexed hereto.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities and Declaration of M. Thomas C. Hix, Local Bankruptcy Rule 6004-1(b), the entire record in the Debtor's case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court.

///

2

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 6004-1(b)(4), any party wishing to respond to the Motion must file with the Court and serve on counsel for the Debtor a written response at least one (1) day prior to the hearing on the Motion. Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve a response to the Motion may be deemed by the Court to be consent to the granting of the relief requested in the Motion.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)     finding that notice of the Motion was adequate and appropriate;

(2)     granting the Motion in its entirety;

(3)     approving the Bidding Procedures as set forth in the Motion;

(4)     authorizing the Debtor to conduct an auction sale of the Property in accordance with the terms and conditions set forth in the Motion;

(5)     setting a hearing to consider approval of a motion for an order approving the sale of the Property and holding an auction on November 9, 2015 at 10:30 a.m.; and

(6)     granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  September 11, 2015

MALIBU ASSOCIATES, LLC

By:_____*/s/ Lindsey L. Smith*_____
      DAVID L. NEALE
      LINDSEY L. SMITH
      LEVENE, NEALE, BENDER, YOO
        & BRILL L.L.P.
      Attorneys for Chapter 11 Debtor and
      Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

**A.    Background And Events Leading To Bankruptcy Filing.**

1.    Malibu Associates, LLC, the debtor and debtor in possession herein (the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 10, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor's principal asset is real property commonly known as the "Malibu Country Club", consisting of 650.98 acres of land and located at 901 Encinal Canyon Road, Malibu, California 90265 (the "Property").

3.    The Debtor also holds a 100% interest in Malibu Golf Club, LLC, which is the entity that operated the golf course and club located on the Property prior to cessation of the operations of the golf course and club in November of 2014.

4.    The Property was purchased by the Debtor in or around 2006 for the purpose of redeveloping the Property and the golf course and structures thereon.

5.    Since the Debtor's acquisition of the Property, the Debtor has been working on obtaining the requisite final land entitlements for the development of the Property, including obtaining approval from the applicable governmental agencies to develop the Property and ultimately, from the California Coastal Commission (the "Entitlements").

6.    In order to fund the Debtor's purchase and redevelopment of the Property, on March 28, 2006 and April 4, 2006, the Debtor obtained loans from California National Bank ("Cal National") in the original principal amounts of $28,500,000 and $11,500,000, respectively (the "Cal National Loans").  The Cal National Loans were secured by deeds of trust (the "Cal National Deeds of Trust") recorded against the Property on March 28, 2006 and June 15, 2006, and which are recorded as instrument numbers 2006-0716907 and 06-1844353. Additionally, the Cal National

Loans were secured by all assets of the Debtor pursuant to a UCC Financing Statement recorded with the California Secretary of State on April 4, 2006 and bearing filing number 06-7065064751.

7.    In 2009, the Debtor defaulted on the Cal National Loans and thereafter, on August 11, 2009, Cal National recorded notices of default on August 11, 2009 as instrument numbers 20091226839 and 20091226840.

8.    On or about October 30, 2009, Cal National was placed in receivership by the Federal Deposit Insurance Corporation (the "<u>FDIC</u>") and the FDIC on that same day assigned substantially all of the assets of Cal National to U.S. Bank, National Association (the "<u>Bank</u>"), including all of Cal National's rights, duties, claims and obligations with respect to the Cal National Loans including, without limitation, Cal National's rights under the Cal National Deeds of Trust.

9.    Subsequently, on November 3, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code thereby commencing bankruptcy case number 1:09-bk-24625-MT (the "<u>First Bankruptcy Case</u>"). During the First Bankruptcy Case, with the approval of the Bankruptcy Court, the Debtor and the Bank entered into a *Consolidation Agreement*, which consolidated, amended, and superseded the Cal National Loans into a single loan in the principal amount of $46,771,683.85 (the "<u>Loan</u>"). The Loan was memorialized in, among other documents, three promissory notes, a loan agreement, and a deed of trust which became the first priority lien against the Property and which was recorded against the Property on June 29, 2011 as instrument number 20110881902 (the "<u>Bank Deed of Trust</u>"). In addition, the Loan is secured by all assets of the Debtor pursuant to a UCC Financing Statement recorded with the California Secretary of State on June 27, 2011 and bearing filing number 11-7274935473.

10.    On January 1, 2015, the Debtor and Aa87, LLC, an Ohio limited liability company ("<u>Aa87</u>") entered in to that certain *Secured Promissory Note* dated January 1, 2015 (the "<u>Note</u>"), and that certain *Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing* dated January 1, 2015 (the "<u>Deed of Trust</u>" together with the Note, the "<u>Pre-Petition Financing Documents</u>") pursuant to which the Debtor obtained a $3,000,000 line of credit from Aa87 for the

purpose of, among other things, covering the Debtor's operating costs and allowing the Debtor to maintain the Property while it attempted to market the Property for sale. Pursuant to the terms of the Pre-Petition Financing Documents, the Deed of Trust is expressly subordinate to the Bank Deed of Trust and prohibits Aa87 from foreclosing or taking any action to enforce its rights under the Note or the Deed of Trust unless and until the Bank is paid in full. The Deed of Trust was recorded against the Property on February 6, 2015 as instrument number 20150138777. The Note and Deed of Trust was assigned by Aa87 to WGNF13, LLC, an Ohio limited liability company ("WGNF") and an Assignment of the Deed of Trust was recorded against the Property on June 15, 2015 as Instrument No. 201507043177. As of the Petition Date, the Debtor had drawn on $473,000.00 of the line of credit provided by Aa87 and now WGNF.

11.    The Debtor did not pay off the Loan on the October 15, 2014 maturity date. Thereafter, the Bank declared an event of default under the Loan and the Bank Deed of Trust and has asserted that all amounts owed under the Loan are due and payable. On October 28, 2014, the bank recorded a notice of default, which appears as instrument number 20110881902 (the "NOD").

12.    Thereafter, on February 2, 2015, the Bank caused to be recorded a Notice of Trustee's Sale with respect to the Property. The Trustee's sale was continued from time to time after the recording of the Notice of Trustee's sale and most recently was continued to March 13, 2015.

13.    Prior to the Petition Date, the Debtor obtained approval of the Entitlements by the Los Angeles Board of Supervisors and other necessary governmental agencies. However, the approval of the Entitlements was delayed due to an appeal ("Appeal") of the earlier approval of the Entitlements in November, 2014 that was filed with the Los Angeles County Board of Supervisors by Unite Here Local 11 (the "Union"), which sought to unionize certain aspects of the final redeveloped project. The Appeal has now been resolved pursuant to that certain *Memorandum of Agreement* dated February 20, 2015 and entered into by and between the Debtor and the Union, pursuant to which the Union agreed to withdraw the Appeal. Even though the Union withdrew the

Appeal on February 20, 2015, it took until March 3, 2015 for the Los Angeles County to process the Notice of Final Action of the CDP approval (the "Notice of Final Action") to be forwarded to the California Coastal Commission. The California Coastal Commission received the Notice of Final Action on March 6, 2015 and the public appeal period terminated on March 19, 2015 at 5:00 p.m. Thus, the Debtor has recently completed the Entitlements process.

14. In order to protect the Debtor's substantial equity in the Property and allow the Debtor time to obtain final approval of all Entitlements, the Debtor was forced to seek relief by filing a voluntary petition under Chapter 11 of the Bankruptcy Code. Through the Debtor's bankruptcy case, the Debtor intends to market and sell the Property and use the proceeds therefrom to pay the Debtor's creditors.

**B.    Significant Events During The Debtor's Bankruptcy Case.**

15. Since the Petition Date, the Debtor has been actively marketing the Property for sale with the help of the Debtor's employed broker, Colliers International.

16. On March 19, 2015, the Debtor filed its *Motion for Entry of an Order: (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C§§ 105, 361, 364(c), 364(d)(1) and 364(e); (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c); and (III) Granting Related Relief* (the "Financing Motion"). Pursuant to the Financing Motion, the Debtor sought a Court order authorizing the Debtor to, among other things, obtain post-petition financing (the "DIP Financing") from Aa87, LLC ("Aa87") on the same terms and conditions as those set forth in the Pre-Petition Financing Documents and subject to the terms and conditions set forth in that certain *Stipulation Authorizing The Debtor To Incur Secured Debt Pursuant To 11 U.S.C. § 364(c)(3)* (the "DIP Financing Stipulation"), which was attached to the Financing Motion, and such other agreements and documents as may be reasonably requested by Aa87 in order to memorialize and effect the DIP Financing (collectively, the "DIP Financing Documents").

17. On March 27, 2015, the Court entered an order approving the Financing Motion and the DIP Financing on an interim basis and thereafter, on May 15, 2015, entered an order

7

approving the Financing Motion and the DIP Financing on a final basis. Since the approval of the DIP Financing, the Debtor has used the DIP Financing to maintain the Property and pay certain expenses related to the Property.

18.    On March 19, 2015, the Debtor filed its *Motion for an Order Authorizing Debtor to Assume Memorandum of Agreement* pursuant to which the Debtor sought a Court order authorizing it to assume the *Memorandum of Agreement* dated February 20, 2015 and entered into with the Union (the "Assumption Motion"). On May 13, 2015, the Court entered an order granting the Assumption Motion and authorizing the Debtor to assume the *Memorandum of Agreement.*

19.    On May 14, 2015, the Debtor filed its *Motion For Authority To Obtain Postpetition Insurance Premium Financing To Obtain General Liability And Property Insurance* pursuant to which the Debtor sought Court authority to obtain insurance premium financing from IPFS Corporation of California, dba IPFS Corporation to purchase real property insurance for the Property (the "Insurance Financing Motion"). On May 20, 2015, the Court entered an order granting the Insurance Financing Motion.

20.    On June 8, 2015, the Debtor filed its *Plan of Reorganization (Dated June 8, 2015)* (the "Plan") and its *Disclosure Statement Describing Debtor's Plan of Reorganization (Dated June 8, 2015)* (the "Disclosure Statement").

21.    On July 13, 2015, the Bank filed its *Motion For Relief From Automatic Stay* (the "Motion for RFS"), pursuant to which the Bank seeks relief from stay to enforce its state law rights in connection with the foreclosure of the Property.

22.    Additionally, on July 13, 2015, the Bank filed its *Motion of U.S. Bank to Convert Case From Chapter 11 to Chapter 7* (the "Motion to Convert").

23.    The Debtor has filed oppositions to the Motion for RFS and the Motion to Convert. Hearings on the Disclosure Statement, Motion for RFS and Motion to Convert are scheduled for September 21, 2015.

///

8

**C.    The Stalking Horse APA.**

24.    The Debtor has entered into a Purchase and Sale Agreement (the "Stalking Horse APA") with Brixton Capital AC, LLC, a Delaware limited liability company (the "Stalking Horse") for the sale of the Property for $35 million[1] (the "Purchase Price"). The sale of the Property pursuant to the Stalking Horse APA is subject to overbid and auction (the "Auction") on the terms set forth in the Stalking Horse APA and described below.[2] Although the due diligence period for the Stalking Horse provided under the Stalking Horse APA has not yet run, the Debtor is filing this Motion at this time at the request of the Bank. A true and correct copy of the Stalking Horse APA is attached to the Declaration of Thomas C. Hix annexed hereto as **Exhibit "1"** and is incorporated herein by reference.

**II.**

**PROPOSED BIDDING PROCEDURES**

In accordance with the Stalking Horse APA, the Debtor has filed this Motion seeking to establish the rules and procedures for the Auction and to approve the following Bidding Procedures[3]:

1.    Qualified Bidder.  In order to participate in the bidding process, each person (a "Potential Bidder"), other than the Stalking Horse, must deliver to the Debtor the following:

- An executed confidentiality agreement in form and substance satisfactory to the Debtor.

- Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Property, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the

---

[1] By the filing of this Motion, the Debtor does not acknowledge that the fair market value of the Property is necessarily $35 million. The Debtor believes that the fair market value of the Property will ultimately be determined at the close of any and all competitive bidding.

[2] Unless otherwise stated, in the event of any inconsistency between the description of the terms of the Stalking Horse APA described herein and the terms of the Stalking Horse APA itself, the terms of the Stalking Horse APA shall govern.

[3] The Bidding Procedures are further detailed in Section 3 of the Stalking Horse APA.

obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to the Debtor.

- A preliminary (non-binding) proposal regarding: (i) the purchase price range; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the purchase price and the requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in Stalking Horse APA; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the sale if selected as a successful bidder, and that the Debtor determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by Stalking Horse Agreement, shall be deemed a "Qualified Bidder."  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, the Debtor shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time that Debtor notifies the Potential Bidder that it is a Qualified Bidder, the Debtor shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Property. The Stalking Horse shall be deemed a Qualified Bidder for purposes of the bidding process.

2.    Due Diligence. Upon being determined a Qualified Bidder, the Debtor shall afford each Qualified Bidder due diligence access to the Property.  Any additional due diligence shall not continue after the Bid Deadline (defined below).

3.    Bid Requirements. All bids must include the following documents (the "Required Bid Documents"):

- A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the closing of the sale of the Property.

- An executed copy of the Debtor's form Purchase and Sale Agreement, together with all Schedules and Schedules marked (a "<u>Marked Agreement</u>") to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Purchase Price.

- A good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Debtor in its sole discretion) payable to the order of Debtor (or such other party as Debtor may determine) in an amount equal to Two Million Dollars ($2,000,000.00).

- Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to the Debtor.

4.    <u>Qualified Bids</u>.  A bid will be considered only if the bid:

- Is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Debtor than, those contained in the Stalking Horse APA.

- Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

- Proposes a transaction that the Debtor determines, in the good faith opinion of its Managing Member, after consultation with its financial advisors, is not materially more burdensome or conditional than the terms of the Stalking Horse APA and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee (defined below), plus (i) in the case of the initial Qualified Bid, Two Hundred Fifty Thousand Dollars ($250,000.00); and (ii) One Hundred Thousand Dollars ($100,000.00)

in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

- Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

- An acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Property in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Stalking Horse or the Marked Agreement.

- Includes a commitment to consummate the purchase of the Property within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase.

- Is received by the Bid Deadline (defined below).

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements. Notwithstanding the foregoing, the Stalking Horse shall be deemed a Qualified Bidder, and the Stalking Horse APA shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction, and the sale. A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Stalking Horse is referred to as a "Subsequent Bid". If the Debtor does not receive any Qualified Bids other than the Stalking Horse APA received from the Stalking Horse, the Debtor will report the same to the Bankruptcy Court and will proceed with the sale pursuant to the terms of the Stalking Horse APA.

5.    <u>Bid Deadline</u>. Notwithstanding the terms of the Stalking Horse APA, a Qualified Bidder that desires to make a bid shall deliver via overnight delivery written copies of its bid to: Malibu Associates, LLC, 2400 Wyandotte Street, Suite B-102, Mountain View, California 94043, with copies to Debtor's counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., Attn:  David L. Neale, Esq., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067, so as to be received not later than 9:00 A.M. (PDT), on October 16, 2015 (the "<u>Bid Deadline</u>").

6.    <u>Bid Protection</u>.  Recognizing the Stalking Horse's expenditure of time, energy and resources, the Debtor has agreed to provide certain bidding protections to the Stalking Horse. Specifically, the Debtor has determined that the Stalking Horse APA will further the goals of the Bidding Procedures by setting a floor for which all other Potential Bids must exceed and, therefore, is entitled to be selected as the Stalking Horse.  As a result, the Debtor has agreed that if the Stalking Horse is not the Successful Bidder and the Property is sold to another and higher overbidder, the Debtor shall pay to the Stalking Horse a break-up fee equal to One Million Dollars ($1,000,000.00) (the "<u>Break-Up Fee</u>").  In the event the Stalking Horse APA is terminated pursuant to certain other provisions thereof, then the Stalking Horse shall be entitled to a claim for the Stalking Horse's reasonable fees and expenses (including, without limitation, reasonable attorneys' fees and costs, expenses of its financial advisors and expenses of other consultants) incurred in connection with the transactions contemplated hereunder (the "<u>Expense Reimbursement</u>") up to a maximum of One Hundred Thousand Dollars ($100,000.00) which shall be paid in connection with the sale of the Property, or in the event that the Property is not sold, then the Stalking Horse shall be entitled to an administrative claim in the amount of the Expense Reimbursement against the Debtor's bankruptcy estate. The payment of the Break-Up Fee and the Expense Reimbursement (as applicable) shall be governed by the provisions of the Stalking Horse APA and the Court order approving the Bidding Procedures.

7.    <u>Sale Hearing</u>.  The hearing on the sale of the property (the "<u>Sale Hearing</u>") will be held before the Honorable Deborah J. Saltzman on November 9, 2015 at 10:30 a.m. or on a date convenient for the Court, but not sooner than thirty (30) days after the removal of the

contingencies by the Stalking Horse at the United States Bankruptcy Court for the Central District of California, located at Courtroom 202, 1415 State Street, Santa Barbara, California 93101, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.  If the Debtor does not receive any Qualified Bids (other than the Qualified Bid of the Stalking Horse), the Debtor will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Property to the Stalking Horse following entry of the Sale Order (as that term is defined in the Stalking Horse APA).  If Debtor does receive additional Qualified Bids, then and notwithstanding the terms of the Stalking Horse APA, at the Sale Hearing, the Court shall hold an auction of the Property on the terms and conditions set forth below (the "Auction"). After the Auction is completed, the Debtor shall seek approval of the Successful Bid, as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)" and such bidder(s), the "Alternate Bidder(s)").  The Debtor's presentation to the Bankruptcy Court of the Successful Bid and the Alternate Bid(s) shall not constitute the Debtor's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either the Debtor or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder, then the Alternate Bid(s) shall be deemed to be the Successful Bid and the Debtor shall effectuate a sale to the Alternate Bidder without further order of the Bankruptcy Court.

8.    Auction, Bidding Increments and Bids Remaining Open.  If the Debtor receives at least one (1) Qualified Bid in addition to the Stalking Horse APA, notwithstanding the terms of the Stalking Horse APA, the Debtor will conduct the Auction of Property upon notice to all Qualified Bidders who have submitted Qualified Bids at the Sale Hearing, in accordance with the following procedures:

- Only the Debtor, the Debtor's Broker (as defined in the Stalking Horse APA), the Stalking Horse, the Stalking Horse's broker, any representative of the secured lenders,

14

and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only the Stalking Horse and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

- At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtor whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, the Debtor shall provide copies of the Qualified Bid or combination of Qualified Bids which the Debtor believes is the highest or otherwise best offer to all Qualified Bidders who have informed the Debtor of their intent to participate in the Auction.

- All bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

- The Debtor may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with the Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection therewith.

- Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least One Hundred Thousand Dollars ($100,000.00) higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse), the Debtor may give effect to any

Break-Up Fee or Expense Reimbursement that may be payable to Stalking Horse under the Stalking Horse APA as well as any assets and/or equity interests to be retained by any the Debtor.

● At the conclusion of the Auction, the Debtor, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Property received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder").

9.    Acceptance of Qualified Bids.  The Debtor shall sell the Property for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the Sale Hearing.  If, after an Auction in which the Stalking Horse: (i) shall have bid an amount in excess of the consideration presently provided for in the Stalking Horse APA with respect to the transactions contemplated under the Stalking Horse APA; and (ii) is the Successful Bidder, it shall pay, at the Closing (as defined in the Stalking Horse APA) under the Stalking Horse APA, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid less (b) the sum of the Break-Up Fee or the Expense Reimbursement (as may be applicable).  The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Stalking Horse's acceptance of the bid.  The Debtor will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

10.    Return of Good Faith Deposit.  Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder, which includes the Stalking Horse) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the

1   Successful Bidder, together with interest thereon, shall be applied against the payment of the

2   Purchase Price upon closing of the sale to the Successful Bidder.  If the Successful Bidder fails

3   to consummate an approved sale because of a breach or failure to perform on the part of such

4   Successful Bidder, the Debtor will not have any obligation to return the Good Faith Deposit

5   deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become

6   property of the Debtor.  On the Return Date, the Debtor shall return the Good Faith Deposits of

7   all other Qualified Bidders, together with the accrued interest thereon.

8                                                **III.**

9                                         **DISCUSSION**

10          Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

11  Rules") govern the scope of the notice to be provided in the event a debtor elects to sell property

12  of the estate under 11 U.S.C. § 363; however, with respect to the procedures to be adopted in

13  conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004

14  provides only that such sale may be by private sale or public auction, and requires only that the

15  debtor provide an itemized list of the property sold together with the prices received upon

16  consummation of the sale.  Fed. R. Bankr. Proc. 6004(f).

17          Neither the Bankruptcy Code nor the Bankruptcy Rules contains specific provisions with

18  respect to the procedures to be employed by a debtor in conducting a public or private sale.

19  However, the Bankruptcy Court has the power to establish reasonable sale procedures.  *See, e.g.,*

20  *Doehring v. Crown Corp. (In re Crown Corporation)*, 679 F.2d 774 (9th Cir. 1982).  As one

21  Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of

22  bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price

23  or greatest overall benefit possible for the estate."  *In re Atlanta Packaging Products, Inc.*, 99

24  B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Additionally, courts have long recognized the need for

25  competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher offers and

26  thus benefits the estate.  Therefore, the objective is 'to maximize bidding, not restrict it.'"  *Id.*

27

28

A corollary to these principles is that the court should not "cherry-pick" among contractual provisions, objecting to select individual portions, if the agreement as a whole is supported by an articulated business judgment.  At least one bankruptcy court has expressly applied this corollary to a transaction including breakup and overbid provisions in the sale of the debtor's business.  In *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the court approved a transaction including provisions relating to a breakup fee and a requirement that overbids be at least $500,000.  In responding to objections to other provisions of the agreement, the court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11.  *Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.,* 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual provisions may be justified by the need to attract a prospective investor.).

114 B.R. at 886.

The Debtor and the Bank believe that the Auction of the Property (if appropriate) and the Bidding Procedures proposed in connection therewith will result in the highest purchase price possible for the Property.  As discussed above, the Property is the Debtor's primary asset that can be liquidated, with the proceeds used to pay the Debtor's creditors. The Debtor submits that the Bidding Procedures are essential to the maximizing the value to be received for the Property and to be paid to the Debtor's creditors. Additionally, the Bidding Procedures will provide structure for the Auction of the Property, with the level of certainty that will be required by potential bidders and other parties in interest. Further, the Bidding Procedures will (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration potential purchasers who do not have the financial ability to consummate the transaction in an expeditious manner; and (iii) ensure that the highest possible purchase price is obtained for the Property.

The Debtor believes that having the Stalking Horse will establish a benchmark price and help attract other bidders and promote competitive bidding. However, the Stalking Horse has expressed that it is only interested in being locked into the Stalking Horse APA and being the stalking horse bidder if there are reasonable protections in the event that the Stalking Horse is overbid at the Auction, including the Breakup Fee and Expense Reimbursement.

Breakup fees such as the ones proposed here in the event of a successful overbid have been approved by numerous other courts.  In general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode ... to attract other bidders to the auction."  In re Financial News Network, Inc., 126 B.R. 152, 154 n.5 (Bankr.S.D.N.Y.1991); see also In re Integrated Resources, Inc., 147 B.R. 650, 653 (S.D.N.Y.1992), app dismissed on jurisdictional grounds, 3 F.3d 49 (2d Cir.1993) ("[a] break-up fee, or more appropriately, a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction").  Agreements to provide breakup fees are designed to compensate the potential acquirer who serves as a catalyst or "stalking horse' which attracts more favorable offers.  In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr.N.D.Ill 1995); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr.S.D.N.Y.1989).

Outside of bankruptcy, a break-up fee is generally allowed as long as it "enhances" the bidding.  In re S.N.A. Nut Co., 186 B.R. at 102.  In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude."  Cottle v. Storer Communication Inc., 849 F.2d 570, 578 (11th Cir.1988); In re 995 Fifth Ave., 96 B.R. at 28.  Generally speaking, whether the payment of a break-up fee is appropriate is evaluated under the "business judgment rule."  In re S.N.A. Nut Co., 186 B.R. at 102.  Under this rule, there is a presumption that, in making a business decision, the principals of the debtor acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.  Therefore, procedures utilized by a corporate debtor with respect to a proposed sale should be approved when the court determines that such procedures are fair and do not violate any of the debtor's fiduciary duties.  Id.

1      In evaluating the appropriateness of a breakup fee, the appropriate question for the court

2  to consider is "whether the break-up fee served any of three possible useful functions: (1) to

3  attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other

4  bidders to follow; or (3) to attract additional bidders." In re Integrated Resources, Inc., 147 B.R.

5  650, 662 (S.D.N.Y.1992). Additionally, so long as the break-up fee or overbid increment is not

6  (1) the product of self-dealing by the debtor or the trustee, (2) likely to hamper or chill, rather

7  than encourage, bidding on the assets to be sold, or (3) unreasonably large in relation to the

8  proposed purchase price, courts have approved the proposed procedures. See, e.g., In re

9  Integrated Resources, Inc., 147 B.R. 650, 657 (S.D.N.Y.1992), appeal dismissed, 3 F. 3d 49 (2d

10  Cir.1993) (a break-up fee is permissible if reasonably related to the bidder's efforts and the

11  transaction's magnitude); see also Cottle v. Storer Communication, 849 F.2d 570, 578-79 (11th

12  Cir.1988); CRTF Corp. v. Federated Dept. Stores, 683 F. Supp. 422, 440 (S.D.N.Y.1988); In re

13  Crowthers McCall Pattern, Inc., 114 B.R. at 879.

14      Break-up fees of between 1-3% of the purchase price have been held to be reasonable.

15  See, e.g., Cottle v. Storer Communication, Inc., 849 F.2d 570 (11th Cir. 1988) ($18 million

16  termination fee approved using business judgment rule where fee was 1.16% of sale price); In re

17  995 Fifth Avenue Associates, L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989) (a $500,000 break-up

18  fee was approved by the Court in the $76 million sale of the Stanhope Hotel in New York City -

19  - the fee was 0.65% of purchase price); Samjens Partners I v. Burlington Indus., 663 F.Supp.

20  614 (S.D.N.Y. 1987) (breakup fee calculated as 2% of the value of the company was "not so

21  onerous as to end the auction"); In re Integrated Resources, 147 B.R. 650 (S.D.N.Y.

22  1992)(approving breakup fee of 1.6% of the proposed purchase price of $565 million); In re

23  T.V.S.I. Holdings, 90 B. 13581-13586, 90 B 13856-13864 (Slip Op.) (Bankr.S.D.N.Y. 1991)

24  (2.54% or $3.5 million break up fee was approved); In re Crowthers McCall Pattern, Inc., 114

25  B.R. 877 (Bankr. S.D.N.Y. 1990) (approving $500,000 break-up fee in a $45 million sale –

26  1.11%); Beebe v. Pacific Realty Trust, 578 F.Supp. 1128 (D. Or. 1984)(termination fee

27  calculated as 1% of the transaction was reasonable); CRTF Corp. v. Federated Dep't Stores,

28

Inc., 683 F. Supp. 422 (S.D.N.Y. 1988)(court approved $45 million in fees in connection with a $5.8 billion transaction or 0.8% of the purchase price).

      The Breakup Fee to be paid to the Stalking Horse in the event of a successful overbid comports with both the "business judgment rule" and is in the best interests of the Debtor's estates and its creditors. The Debtor believes that the Breakup Fee and Expense Reimbursement requested herein are reasonable for several reasons: (i) having invested significant time and financial resources in a transaction, including by conducting due diligence prior to submitting an offer, in the event of a successful overbid, the Stalking Horse wants to recoup its time, effort, costs and expenses and insure that it will not lose money as a result of its efforts to acquire the Property, (ii) being able to recover the break-up fee incentivized the Stalking Horse to lock itself into the Stalking Horse APA, as similar protections will not be offered to other bidders, (iii) to the extent other bidders extend overbids, it is the Debtor's belief that such overbids will likely be premised, in large measure, upon the Stalking Horse's completion of its due diligence and expressed satisfaction with the results thereof; therefore, by performing its due diligence and agreeing to proceed with the sale, the Stalking Horse will confer a benefit upon the estate herein by "legitimizing" the sale and the Stalking Horse should be compensated in the event the Stalking Horse is outbid at the auction, and (iv) the Debtor, and likely the Stalking Horse, are concerned about unqualified or unserious bidders upsetting the proposed sale to obtain a competitive advantage or some other economic benefit at the Debtor's (and the Stalking Horse's) expense; the Breakup Fee and Expense Reimbursement were therefore designed to insure that only serious, financially and operationally qualified potential bidders would participate in the bidding process. The Debtors believe that the proposed Breakup Fee of approximately 2.8% of the Purchase Price of $35,000,000 for the Property is reasonable and constitutes "fair and reasonable percentage[s] of the purchase price[s], and [are] reasonably related to the risk, effort, and expenses of the prospective purchaser[s]." In re Integrated Resources, Inc., 147 B.R. at 662; In re 995 Fifth Ave. Assoc., L.P., 96 B.R. at 28.

///

## IV.    <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

(1)    finding that notice of the Motion was adequate and appropriate;

(2)    granting the Motion in its entirety;

(3)    approving the Bidding Procedures as set forth in the Motion;

(4)    authorizing the Debtor to conduct an auction sale of the Property in accordance with the terms and conditions set forth in the Motion;

(5)    setting a hearing to consider approval of a motion for an order approving the sale of the Property and holding an auction on November 9, 2015 at 10:30 a.m.; and

(6)    granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  September 11, 2015                    MALIBU ASSOCIATES, LLC

By:    */s/ Lindsey L. Smith*
                                                            DAVID L. NEALE
                                                            LINDSEY L. SMITH
                                                            LEVENE, NEALE, BENDER, YOO
                                                                & BRILL L.L.P.
                                                            Attorneys for Chapter 11 Debtor and
                                                            Debtor in Possession

# DECLARATION OF THOMAS C. HIX

I, Thomas C. Hix, hereby declare as follows:

1.      I am over 18 years of age.  I am the President of the co-managing member of Malibu Associates, LLC, a California limited liability company, debtor and debtor in possession herein (the "Debtor").  Accordingly, I am familiar with the business operations and financial books and records of the Debtor. I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I have access to the Debtor's books and records. I am familiar with the history, organization, operations and financial condition of the Debtor.  The records and documents referred to in this Declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my knowledge of the Debtor's books and records.

3.      I submit this declaration in support of the foregoing *Motion For Order Establishing Bidding Procedures For Sale Of Debtor's Property Free And Clear Of All Liens, Claims, Encumbrances And Other Interests Pursuant to 11 U.S.C. §§ 105 And 363* (the "Motion").

4.      The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on March 10, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.      The Debtor's principal asset is real property commonly known as the "Malibu Country Club", consisting of 650.98 acres of land and located at 901 Encinal Canyon Road, Malibu, California 90265 (the "Property").

6.      The Debtor also holds a 100% interest in Malibu Golf Club, LLC, which is the entity that operated the golf course and club located on the Property prior to cessation of the

operations of the golf course and club in November of 2014.

7.    The Property was purchased by the Debtor in or around 2006 for the purpose of redeveloping the Property and the golf course and structures thereon.

8.    Since the Debtor's acquisition of the Property, the Debtor has been working on obtaining the requisite final land entitlements for the development of the Property, including obtaining approval from the applicable governmental agencies to develop the Property and ultimately, from the California Coastal Commission (the "Entitlements").

9.    In order to fund the Debtor's purchase and redevelopment of the Property, on March 28, 2006 and April 4, 2006, the Debtor obtained loans from California National Bank ("Cal National") in the original principal amounts of $28,500,000 and $11,500,000, respectively (the "Cal National Loans"). The Cal National Loans were secured by deeds of trust (the "Cal National Deeds of Trust") recorded against the Property on March 28, 2006 and June 15, 2006, and which are recorded as instrument numbers 2006-0716907 and 06-1844353. Additionally, the Cal National Loans were secured by all assets of the Debtor pursuant to a UCC Financing Statement recorded with the California Secretary of State on April 4, 2006 and bearing filing number 06-7065064751.

10.    In 2009, the Debtor defaulted on the Cal National Loans and thereafter, on August 11, 2009, Cal National recorded notices of default on August 11, 2009 as instrument numbers 20091226839 and 20091226840.

11.    On or about October 30, 2009, Cal National was placed in receivership by the Federal Deposit Insurance Corporation (the "FDIC") and the FDIC on that same day assigned substantially all of the assets of Cal National to U.S. Bank, National Association (the "Bank"), including all of Cal National's rights, duties, claims and obligations with respect to the Cal National Loans including, without limitation, Cal National's rights under the Cal National Deeds of Trust.

12.    Subsequently, on November 3, 2009, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code thereby commencing bankruptcy case number 1:09-bk-24625-MT (the "First Bankruptcy Case"). During the First Bankruptcy Case, with the approval of the

Bankruptcy Court, the Debtor and the Bank entered into a *Consolidation Agreement*, which consolidated, amended, and superseded the Cal National Loans into a single loan in the principal amount of $46,771,683.85 (the "Loan"). The Loan was memorialized in, among other documents, three promissory notes, a loan agreement, and a deed of trust which became the first priority lien against the Property and which was recorded against the Property on June 29, 2011 as instrument number 20110881902 (the "Bank Deed of Trust"). In addition, the Loan is secured by all assets of the Debtor pursuant to a UCC Financing Statement recorded with the California Secretary of State on June 27, 2011 and bearing filing number 11-7274935473.

13.     On January 1, 2015, the Debtor and Aa87, LLC, an Ohio limited liability company ("Aa87") entered in to that certain *Secured Promissory Note* dated January 1, 2015 (the "Note"), and that certain *Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing* dated January 1, 2015 (the "Deed of Trust" together with the Note, the "Pre-Petition Financing Documents") pursuant to which the Debtor obtained a $3,000,000 line of credit from Aa87 for the purpose of, among other things, covering the Debtor's operating costs and allowing the Debtor to maintain the Property while it attempted to market the Property for sale. Pursuant to the terms of the Pre-Petition Financing Documents, the Deed of Trust is expressly subordinate to the Bank Deed of Trust and prohibits Aa87 from foreclosing or taking any action to enforce its rights under the Note or the Deed of Trust unless and until the Bank is paid in full. The Deed of Trust was recorded against the Property on February 6, 2015 as instrument number 20150138777. The Note and Deed of Trust was assigned by Aa87 to WGNF13, LLC, an Ohio limited liability company ("WGNF") and an Assignment of the Deed of Trust was recorded against the Property on June 15, 2015 as Instrument No. 201507043177. As of the Petition Date, the Debtor had drawn on $473,000.00 of the line of credit provided by Aa87 and now WGNF.

14.     The Debtor did not pay off the Loan on the October 15, 2014 maturity date. Thereafter, the Bank declared an event of default under the Loan and the Bank Deed of Trust and has asserted that all amounts owed under the Loan are due and payable. On October 28, 2014, the

bank recorded a notice of default, which appears as instrument number 20110881902 (the "NOD").

15.    Thereafter, on February 2, 2015, the Bank caused to be recorded a Notice of Trustee's Sale with respect to the Property.  The Trustee's sale was continued from time to time after the recording of the Notice of Trustee's sale and most recently was continued to March 13, 2015.

16.    Prior to the Petition Date, the Debtor obtained approval of the Entitlements by the Los Angeles Board of Supervisors and other necessary governmental agencies. However, the approval of the Entitlements was delayed due to an appeal ("Appeal") of the earlier approval of the Entitlements in November, 2014 that was filed with the Los Angeles County Board of Supervisors by Unite Here Local 11 (the "Union"), which sought to unionize certain aspects of the final redeveloped project. The Appeal has now been resolved pursuant to that certain *Memorandum of Agreement* dated February 20, 2015 and entered into by and between the Debtor and the Union, pursuant to which the Union agreed to withdraw the Appeal. Even though the Union withdrew the Appeal on February 20, 2015, it took until March 3, 2015 for the Los Angeles County to process the Notice of Final Action of the CDP approval (the "Notice of Final Action") to be forwarded to the California Coastal Commission.  The California Coastal Commission received the Notice of Final Action on March 6, 2015 and the public appeal period terminated on March 19, 2015 at 5:00 p.m. Thus, the Debtor has recently completed the Entitlements process.

17.    In order to protect the Debtor's substantial equity in the Property and allow the Debtor time to obtain final approval of all Entitlements, the Debtor was forced to seek relief by filing a voluntary petition under Chapter 11 of the Bankruptcy Code. Through the Debtor's bankruptcy case, the Debtor intends to market and sell the Property and use the proceeds therefrom to pay the Debtor's creditors.

18.    Since the Petition Date, the Debtor has been actively marketing the Property for sale with the help of the Debtor's employed broker, Colliers International.

///

19.    On March 19, 2015, the Debtor filed its *Motion for Entry of an Order: (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 364(c), 364(d)(1) and 364(e); (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c); and (III) Granting Related Relief* (the "Financing Motion"). Pursuant to the Financing Motion, the Debtor sought a Court order authorizing the Debtor to, among other things, obtain post-petition financing (the "DIP Financing") from Aa87, LLC ("Aa87") on the same terms and conditions as those set forth in the Pre-Petition Financing Documents and subject to the terms and conditions set forth in that certain *Stipulation Authorizing The Debtor To Incur Secured Debt Pursuant To 11 U.S.C. § 364(c)(3)* (the "DIP Financing Stipulation"), which was attached to the Financing Motion, and such other agreements and documents as may be reasonably requested by Aa87 in order to memorialize and effect the DIP Financing (collectively, the "DIP Financing Documents").

20.    On March 27, 2015, the Court entered an order approving the Financing Motion and the DIP Financing on an interim basis and thereafter, on May 15, 2015, entered an order approving the Financing Motion and the DIP Financing on a final basis. Since the approval of the DIP Financing, the Debtor has used the DIP Financing to maintain the Property and pay certain expenses related to the Property.

21.    On March 19, 2015, the Debtor filed its *Motion for an Order Authorizing Debtor to Assume Memorandum of Agreement* pursuant to which the Debtor sought a Court order authorizing it to assume the *Memorandum of Agreement* dated February 20, 2015 and entered into with the Union (the "Assumption Motion"). On May 13, 2015, the Court entered an order granting the Assumption Motion and authorizing the Debtor to assume the *Memorandum of Agreement*.

22.    On May 14, 2015, the Debtor filed its *Motion For Authority To Obtain Postpetition Insurance Premium Financing To Obtain General Liability And Property Insurance* pursuant to which the Debtor sought Court authority to obtain insurance premium financing from IPFS Corporation of California, dba IPFS Corporation to purchase real property insurance for the Property (the "Insurance Financing Motion"). On May 20, 2015, the Court entered an order granting the Insurance Financing Motion.

23.     On June 8, 2015, the Debtor filed its *Plan of Reorganization (Dated June 8, 2015)* (the "Plan") and its *Disclosure Statement Describing Debtor's Plan of Reorganization (Dated June 8, 2015)* (the "Disclosure Statement").

24.     On July 13, 2015, the Bank filed its *Motion For Relief From Automatic Stay* (the "Motion for RFS"), pursuant to which the Bank seeks relief from stay to enforce its state law rights in connection with the foreclosure of the Property.

25.     Additionally, on July 13, 2015, the Bank filed its *Motion of U.S. Bank to Convert Case From Chapter 11 to Chapter 7* (the "Motion to Convert").

26.     The Debtor has filed oppositions to the Motion for RFS and the Motion to Convert. Hearings on the Disclosure Statement, Motion for RFS and Motion to Convert are scheduled for September 21, 2015.

27.     The Debtor has entered into a Purchase and Sale Agreement (the "Stalking Horse APA") with Brixton Capital AC, LLC, a Delaware limited liability company (the "Stalking Horse") for the sale of the Property for $35 million (the "Purchase Price"). The sale of the Property pursuant to the Stalking Horse APA is subject to overbid and auction (the "Auction") on the terms set forth in the Stalking Horse APA and described below. Although the due diligence period for the Stalking Horse provided under the Stalking Horse APA has not yet run, the Debtor is filing this Motion at this time at the request of the Bank. A true and correct copy of the Stalking Horse APA is attached hereto as **Exhibit "1"** and is incorporated herein by reference.

28.     I believe that the Auction of the Property (if appropriate) and the Bidding Procedures proposed in connection therewith will result in the highest purchase price possible for the Property.

///
///
///
///
///

28

29.    I believe that the Breakup Fee to be paid to the Stalking Horse in the event of a successful overbid comports with both the "business judgment rule" and is in the best interests of the Debtor's estates and its creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this 11Th day of September, 2015, at Mountain View, California.

THOMAS C. HIX

29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"

# [STALKING HORSE APA]

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (the "Agreement") is entered into as of August 19th, 2015, by and between MALIBU ASSOCIATES, LLC, a California limited liability company ("Seller" or "Debtor"), and BRIXTON CAPITAL AC, LLC, a Delaware limited liability company, as buyer ("Buyer" and together with Seller, the "Parties" or as to each, a "Party"). As used herein, the term "Effective Date" shall mean the date on which this Agreement is executed by the last of Buyer or Seller to so execute this Agreement.

### RECITALS

The Parties enter into this Agreement on the basis of the following facts, understandings and intentions:

A.    Seller owns approximately 650.98 acres of land, partially improved, having a common street address of 901 Encinal Canyon Road, Malibu, California 90265 and the legal description of which is more particularly described on Exhibit A hereto (the "Land").

B.    On March 10, 2015 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") commencing the chapter 11 bankruptcy case designated as *In re Malibu Associates, LLC*, Case No. 9:15-bk-10477-DS (Bankr. C.D. Cal., Northern Division (the "Bankruptcy Case"). Since the Petition Date, Seller has remained in possession of its property, including the Land, and has continued to operate its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

C.    Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 105, 363, 365 and 1146 of the Bankruptcy Code, Seller desires to sell all right, title and interest of Seller in and to the Purchased Assets (as hereinafter defined), and Buyer wish to make such purchase; subject to the conditions set forth in this Agreement.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants and agreements of the Parties as herein set forth, the Parties hereto agree as follows:

**1.     Definitions**.  Certain terms have the meanings ascribed to them elsewhere in the text of this Agreement.  In addition, as used in this Agreement, the following terms shall have the following designated meanings:

1.1     "Assumed Contracts" shall have the meaning set forth in Paragraph 2.3.

1.2     "Bankruptcy Code" means title 11 and applicable portions of titles 18 and 28 of the United States Code, as amended from time to time.

1.3     "Business Day" shall mean and refer to any day which is not a Saturday, Sunday or Holiday.

1.4     "Excluded Assets" shall have the meaning set forth in Paragraph 2.2.



1.5    "Final Order" means an order of the Bankruptcy Court or other court of competent jurisdiction: (a) as to which no appeal, notice of appeal, or motion for rehearing or new trial has been timely filed and as to which the time for instituting an appeal or motion for rehearing or new trial shall have expired; (b) if an appeal, notice of appeal, or motion for rehearing or new trial has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material respects without the possibility for further appeal or rehearing thereon; or (c) if agreed to by Buyer in its sole discretion, entered on the court's docket and not subject to stay by order, statute, rule or operation of law.

1.6    "Holiday" shall mean and refer to all and only those holidays: (i) specified in, or determined in accordance with, the provisions of Sections 6700 and 6701 of the California Government Code; (ii) any mandatory federal holidays during which deliveries by the United States Postal Service are suspended; and, (iii) with respect to any act which involves the recordation of any document, any other day upon which the Recorder's Office in the County of Los Angeles, California is not open for the recordation of documents.

1.7    "Purchased Assets" shall have the meaning set forth in Paragraph 2.1.

1.8    "Purchase Price" shall have the meaning set forth in Paragraph 4.1.

1.9    "Retained Books and Records" means (i) any documents (including books and records) that Seller is prohibited (or reasonably believe to be prohibited) by applicable law to sell and transfer, (ii) corporate seals, minute books, charter documents, corporate stock record books, original tax and financial records and such other books and records as pertain to the organization, existence, actions or share capitalization of Seller, and (iii) any books and records or information related exclusively to any of the Excluded Assets.

1.10    "Sale Hearing" means the hearing of the Bankruptcy Court related to the approval of the proposed sale of the Purchased Assets to Buyer and the assumption and assignment of the Assumed Contracts of Seller by Buyer.

1.11    "Sale Motion" means the motion to be filed with the Bankruptcy Court seeking approval of the sale of the Purchased Assets to Buyer and the assumption and assignment of the Assumed Contracts of Seller by Buyer.

1.12    "Sale Order" means the Final Sale Order, in form and substance satisfactory to Buyer in its sole discretion, but generally in the form attached hereto as Exhibit B, entered by the Bankruptcy Court pursuant to Sections 363 and/or 365, as applicable, of the Bankruptcy Code, authorizing the sale of the Purchased Assets to Buyer and the assumption and assignment of the Assumed Contracts by Seller to Buyer without further auction of the Purchased Assets and/or the Assumed Contracts or overbidding for the Purchased Assets and/or the Assumed Contracts by parties other than Buyer.  The Sale Order shall contain a finding that Buyer is a good faith purchaser within the meaning of 11 U.S.C. §363(m).  Seller shall cooperate with Buyer to provide the Bankruptcy Court such evidence in possession of Buyer as may be necessary for the Bankruptcy Court to make such a finding.

1.13    "Sale Procedures Motion" means *the Debtor's Motion for Order (1) Approving Sale Procedures and Break-Up Fee in Connection with the Proposed Sale of Substantially All*

2

*Assets of the Debtor's Estate; (2) Approving the Form and Manner of the Sale Notice and Approving Procedures to Determine and Fix Cure Costs; and (3) Scheduling an Auction and/or Hearing to Approve the Sale.*

1.14   "Sale Procedures Order" means the order of the Bankruptcy Court approving the Sale Procedures Motion.

1.15   "UNITE HERE Local 11" means a labor union whose organizational and/or corporate structure is not known by Seller.

## 2.   Purchase and Sale Transaction.

2.1   Property To Be Conveyed.  Seller shall sell to Buyer, and Buyer shall purchase from Seller, the following described property (collectively, the "Purchased Assets"), on all of the terms, covenants and conditions provided herein:

2.1.1   The Land;

2.1.2   All improvements located on the Land (the "Improvements");

2.1.3   All of Seller's right, title and interest in all rights, privileges, easements and appurtenances benefiting the Land and/or the Improvements, including, without limitation, Seller's interest, if any, in, to and under (i) all minerals, oil, gas and other hydrocarbon substances on and under the Land, as well as all zoning and development rights, air rights, water, water rights and water stock relating to the Real Property; (ii) rights in and to land lying in the bed of any highways, streets, roads or avenues and other public rights of way and rights of access thereto, open or proposed, in front of or adjoining any such parcel or any portion thereof, to the center line thereof, and all right, title and interest for damage to any such parcel and improvements or any portion thereof by reason of any change of grade of any street, and other rights pertaining to the Real Property; (iii) rights in and to strips and gores of land within or adjoining the Real Property; (iv) rights to utility connections and hook ups, and (v) all other easements, rights-of-way and other appurtenances used or connected with the beneficial use or enjoyment of the Land and/or the Improvements (the Land, the Improvements and all such rights, privileges, easements and appurtenances are sometimes collectively hereinafter referred to as the "Real Property");

2.1.4   All tangible personal property, equipment, supplies and fixtures owned by Seller and used in the operation of, and located at, the Real Property as of the Closing Date (collectively, the "Tangible Personal Property"), if any;

2.1.5   To the extent assignable, all of Seller's interest in any intangible personal property, contract rights, warranties, guaranties, licenses, permits, entitlements, governmental approvals and certificates of occupancy which relate to and/or benefit the Real Property (the "Intangible Personal Property" and, together with the Tangible Personal Property, the "Personal Property");

2.1.6   Seller's interest in all Assumed Contracts relating to the Purchased Assets.

3

2.1.7   Seller's interest in the name "Malibu Institute" and any and all trademarks or copyrights associated with said name.

2.2    Excluded Assets.  Notwithstanding the foregoing, the Purchased Assets shall not include the Seller's or the Seller's bankruptcy estate's interest, as the case may be, in any of the following (collectively, the "Excluded Assets"): (i) any property management office computers and all related proprietary software; (ii) any tangible personal property, equipment, supplies and/or fixtures owned by any tenant of the Property; (iii) cash, bank or other deposit accounts, (iv) refunds of prepaid expenses including, without limitation, insurance premiums, (v) tax refunds for periods prior to Closing, (vi) all insurance and other claims arising prior to the Effective Date; (vii) any right to pursue action or proceeding pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549 or 550 of the Bankruptcy Code against persons other than the Buyer; (viii) any right to pursue an action or proceeding to recover property for or on behalf of Seller's Estate or to avoid a lien or transfer of the property of Seller's bankruptcy estate against persons other than the Buyer; (iii) the Retained Books and Records; Accounts Receivable; (iv) Cash on Hand.

2.3    Assumed Contracts.

2.3.1   Assumed Contracts.  In connection with the Closing (as hereinafter defined) and  pursuant to Section 365 of the Bankruptcy Code, Buyer shall assume and Seller shall assign those leasing, service, supply and/or maintenance contracts which are assignable by Seller and which (i) cannot be terminated by Seller on or before the Closing Date (as hereinafter defined) without penalty, or (ii) which Buyer elects to assume (with Seller's permission) by written notice to Seller on or before the expiration of the Inspection Period (as hereinafter defined) (collectively, the "Assumed Contracts").  Buyer shall be deemed to have elected not to assume any Contracts which can be terminated by Seller, without penalty, on or before the Closing Date and which Buyer does not identify, by written notice to Seller before the expiration of the Inspection Period, as being contracts that Buyer elects to assume.

2.3.2   Bankruptcy Court Approval.  Seller shall use reasonable efforts to obtain authorization from the Bankruptcy Court under Section 365 of the Bankruptcy Code with respect to the assignment of the Assumed Contracts; provided, however, that Seller's inability to obtain such approval shall not be a default hereunder or be a condition precedent to Buyer's obligations to close hereunder.

2.4    Memorandum of Understanding.  Seller has executed the Memorandum of Agreement with UNITE HERE Local 11 dated February 20, 2015 attached hereto as Exhibit E (the "MOA").  The provisions of subsections (b), (c), (d), (e), (f), (g), (h) and (i) of Section 4 of the MOA are incorporated in this Agreement by this reference fully and completely as if set forth at length herein.

## 3.    Bidding Procedures.

3.1    Initial Bankruptcy Actions.  This Article 3 sets forth the bidding procedures (the "Bidding Procedures") to be employed with respect to the Agreement and the sale (the "Sale") of the Purchased Assets.  The Sale is subject to competitive bidding as set forth herein and approval

4

by the Bankruptcy Court in the Sale Order.  The following overbid provisions and related bid protections are designed to compensate the Buyer for its efforts and agreements to date and to facilitate a full and fair process (the "Bidding Process") designed to maximize the value of the Purchased Assets for the benefit of Sellers' and their Affiliates' creditors, shareholders and bankruptcy estate.

      3.2    Qualified Bidder.  Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Seller, in order to participate in the bidding process, each person (a "Potential Bidder"), other than the Buyer, must deliver (unless previously delivered) to Sellers:

      3.2.1    An executed confidentiality agreement in form and substance satisfactory to Sellers.

      3.2.2    Current audited financial of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Seller and its financial advisors; and

      3.2.3    A preliminary (non-binding) proposal regarding: (i) the purchase price range; (ii) any assets and/or equity interests expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the Purchase Price and the requisite financial assurance); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale, if selected as a successful bidder, and that the Seller determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement shall be deemed a "Qualified Bidder".  Notwithstanding the foregoing, Buyer shall be deemed a Qualified Bidder for purposes of the Bidding Process.

      3.3    Bid Deadline.  A Qualified Bidder that desires to make a bid shall deliver via overnight delivery written copies of its bid to: Malibu Associates, LLC, 2400 Wyandotte Street, Suite B-102, Mountain View, California 94043, with copies to:  (i) Seller's counsel, Levene Neale Bender Yoo & Brill L.L.P., Attn: David L. Neale, Esq., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067, and (ii) Colliers International, Attn: Keith Cubba, 3960 Howard Hughes Parkway, Suite 150, Las Vegas, Nevada 89169; so as to be received not later than 9:00 A.M. (PDT), on _____, 2015 **[insert date that is no more than five (5) Business Days before date of Sale Hearing]** (the "Bid Deadline").  As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Seller shall determine, and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  At the same time

5

that Seller notifies the Potential Bidder that it is a Qualified Bidder, Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Purchased Assets as provided in Paragraph 3.4 below.

3.4    Due Diligence.  Seller shall afford each Qualified Bidder due diligence access to the Purchased Assets.  Due diligence access may include management presentations as may be scheduled by Seller, access to data rooms, onsite inspections and such other matters which a Qualified Bidder may request and as to which Seller, in its sole discretion, may agree to.  Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders.  Any additional due diligence shall not continue after the Bid Deadline.  Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections.  Neither Seller nor any of its affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Purchased Assets to any person other than to Qualified Bidders who make an acceptable preliminary proposal.

3.5    Bid Requirements.  All bids must include the following documents (the "Required Bid Documents"):

3.5.1    A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the closing of the Sale of the Purchased Assets.

3.5.2    An executed copy of the Agreement, together with all Schedules and Schedules marked (a "Marked Agreement") to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Purchase Price.

3.5.3    A good faith deposit (the "Good Faith Deposit") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to **Two** Million Dollars ($2,000,000.00).

3.5.4    Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Seller and its advisors.

3.6    Qualified Bids.  A bid will be considered only if the bid:

3.6.1    Is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Seller than, those contained in the Agreement.

3.6.2    Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

3.6.3    Proposes a transaction that Seller determines, in the good faith opinion of its Managing Member, after consultation with its financial advisors, is not materially more burdensome or conditional than the terms of the Agreement and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum

6

of the Purchase Price plus the amount of the Break-Up Fee , plus (i) in the case of the initial Qualified Bid, Two Hundred Fifty Thousand Dollars ($250,000.00); and (ii) One Hundred Thousand Dollars ($100,000.00) in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

       3.6.4   Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

       3.6.5   An acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

       3.6.6   Includes a commitment to consummate the purchase of the Purchased Assets within not more than fifteen (15) days after entry of the Sale Order by the Bankruptcy Court approving such purchase.

       3.6.7   Is received by the Bid Deadline.

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents and meets all of the above requirements.  Notwithstanding the foregoing, the Buyer shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the bidding process, the Auction (as defined in Paragraph 3.8), and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction. Each Qualified Bid other than that of the Buyer is referred to as a "Subsequent Bid".  If Seller does not receive any Qualified Bids other than the Agreement received from the Buyer, Seller will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

       3.7   Bid Protection.  Recognizing the Buyer's expenditure of time, energy and resources, Seller has agreed to provide certain bidding protections to the Buyer.  Specifically, Seller has determined that the Agreement will further the goals of the Bidding Procedures by setting a floor for which all other Potential Bids must exceed and, therefore, is entitled to be selected as the Buyer.  As a result, Seller has agreed that if the Buyer is not the Successful Bidder and the Property is sold to another and higher over bidder, Seller shall pay to the Buyer a break-up fee equal to One Million Dollars ($1,000,000.00) (the "Break-Up Fee"). In the event the Agreement is terminated pursuant to certain other provisions hereof, then the Buyer shall be entitled to a claim for the Buyer's reasonable fees and expenses (including, without limitation, reasonable attorneys' fees and costs, expenses of its financial advisors and expenses of other consultants) incurred in connection with the transactions contemplated hereunder (the "Expense Reimbursement") up to a maximum of One Hundred Dollars ($100,000.00) which shall be paid in connection with the sale of the Purchased Assets, or in the event that the Purchased Assets are

7

not sold, then the Buyer shall be entitled to an administrative claim in the amount of the Expense Reimbursement against the Debtor's bankruptcy estate. The payment of the Break-Up Fee or the Expense Reimbursement (as applicable) shall be governed by the provisions of the Agreement and the Sale Procedures Order.

      3.8    <u>Auction, Bidding Increments and Bids Remaining Open</u>.  If Seller receives at least one (1) Qualified Bid in addition to the Agreement, Seller will conduct an auction (the "<u>Auction</u>") of the Purchased Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. PDT on or before the tenth (10th) Business Day following the expiration of the Bid Deadline, at the offices of Levene Neale Bender Yoo & Brill L.L.P., Attn:  David L. Neale, Esq., 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067 or such later time or other place as Seller shall notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

      3.8.1    Only Seller, Seller's Broker (as defined in Paragraph 11.1), Buyer, Buyer's broker, any representative of the secured lenders, and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only Buyer and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

      3.8.2    At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Seller whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which Seller believes is the highest or otherwise best offer to all Qualified Bidders who have informed Seller of their intent to participate in the Auction.

      3.8.3    All bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

      3.8.4    Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

      3.8.5    Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least One Hundred Thousand Dollars ($100,000.00) higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Buyer), Seller may give effect to any Break-Up Fee or Expense Reimbursement that may be

payable to Buyer under the Agreement as well as any assets and/or equity interests to be retained by any Seller.

3.8.6    At the conclusion of the Auction, or as soon thereafter as practicable, Seller, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Purchased Assets received at the Auction (the "Successful Bid" and the bidder making such bid, the "Successful Bidder").

3.9    Acceptance of Qualified Bids.  Seller shall sell the Purchased Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "Sale Hearing").  If, after an Auction in which the Buyer: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid less (b) the sum of the Break-Up Fee or the Expense Reimbursement (as may be applicable).  Seller's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Seller's acceptance of the bid.  Seller will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

3.10    Sale Hearing.  The Sale Hearing will be held before the Honorable Deborah J. Saltzman at a date to be determined by the parties and the Court, but not sooner than thirty (30) after the removal of the contingencies by the Buyer at the United States Bankruptcy Court for the Central District of California, located at Courtroom 202, 1415 State Street, Santa Barbara, California 93101, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.  If Seller does not receive any Qualified Bids (other than the Qualified Bid of the Buyer), Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Purchased Assets to the Buyer following entry of the Sale Order.  If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid, as well as the second highest or best Qualified Bid(s) (the "Alternate Bid(s)" and such bidder(s), the "Alternate Bidder(s)").  Seller's presentation to the Bankruptcy Court of the Successful Bid and the Alternate Bid(s) shall not constitute Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Seller or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder, then the Alternate Bid(s) shall be deemed to be the Successful Bid and Seller shall effectuate a sale to the Alternate Bidder without further order of the Bankruptcy Court.

3.11    Return of Good Faith Deposit.  Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder, which includes the Buyer) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "Return Date").

Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder, together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder. If the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Sellers. On the Return Date, Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

3.12    Seller, after consultation with the agents for its secured lenders: (i) may determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) may reject at any time, any bid (other than the Buyer's bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale; or (c) contrary to the best interests of Seller, its estate and creditors as determined by Seller in its sole discretion

## 4.    Purchase Price.

4.1    Purchase Price.  In the event that there are no Qualified Bids, and the Buyer is approved as the Successful Bidder, at the Close of Escrow, Buyer shall pay (i) Seller a cash purchase price in the amount of Thirty-Five Million Dollars ($35,000,000.00) (the "Cash Purchase Price") for the Purchased Assets (including the closing costs to be paid by Buyer pursuant to Paragraph 9.3 hereof) (the "Purchase Price").

4.2    Purchase Price Adjustment for Buyer Following Auction.  In the event of an Auction and if the Buyer is the Successful Bidder, the Buyer shall pay Seller the Purchase Price.

.

4.3    Deposits.

4.3.1    Initial Deposit.  Within two (2) Business Days after the Effective Date, Buyer shall deposit with First American Title Insurance Company (in its capacity as escrow holder, the "Escrow Agent"), at its offices at 4380 La Jolla Village Drive, Suite 110, San Diego, CA 92122 (Attn: Janine Hudson) Tel: 858-410-5767 , by wire transfer of immediately available federal funds in accordance with the wiring instructions set forth on the Joinder by Escrow Agent attached hereto, the amount of One Million  Dollars ($1,000,000.00) (the "Initial Deposit")

4.3.2    Additional Deposit and Sole Order Escrow.  Notwithstanding anything to the contrary contained in this Agreement, prior to the Inspection Period Expiration Date (as hereinafter defined), the Escrow Agent shall act solely in accordance with the instructions of Buyer until the Inspection Period Expiration Date in respect of the Deposit. In the event that on or prior to the Inspection Period Expiration Date, Buyer delivers notice to Escrow Agent stating that Buyer has elected to terminate this Agreement or is otherwise deemed to have terminated as provided in Paragraph 5.5, then Escrow Agent shall refund to Buyer the Deposit without any requirement that Escrow Agent first notify or obtain any approval or consent of Seller. Seller agrees in such instance not to deliver any conflicting instructions to Escrow Agent for any reason and hereby instructs the Escrow Agent to act in respect of the Deposit solely in accordance with

10

Buyer's instructions on or prior to the Inspection Period Expiration Date, including instructions of Buyer to return the Deposit to Buyer. Seller shall indemnify Buyer against any costs or expenses incurred by Buyer and arising out of Seller's actions in contravention of this provision. If Buyer does not terminate this Agreement prior to the expiration of the Inspection Period either by providing the Termination Notice or pursuant to Paragraph 5.5, time being of the essence, Buyer shall deposit with Escrow Agent by wire transfer of immediately available funds, the additional sum of One Million Dollars ($1,000,000.00) together with any interest earned thereon while held by the Escrow Agent the "Additional Deposit", and together with the Initial Deposit, the "Deposit"). Remittance of the Additional Deposit to the Escrow Agent at any time prior to the Inspection Period Expiration Date shall be evidence of Buyer's affirmative satisfaction or waiver of all due diligence and inspection contingencies and, except as otherwise provided herein, the Deposit shall become non-refundable.

4.3.3   Deposits Following Termination. If Buyer terminates this Agreement prior to the expiration of the Inspection Period by delivering the Termination Notice or otherwise as provided in Paragraph 5.5, then Paragraphs 4.3.2 and 5.5 hereof shall govern the return of the Deposit to Buyer. Except as otherwise expressly provided above in this Paragraph 4.3.3, the Deposit will be non-refundable to Buyer upon the timely remittance of the Additional Deposit to the Escrow Agent as provided in Paragraph 4.3.2 , unless (i) Buyer terminates this Agreement pursuant to Paragraph 5.3.1, 5.3.3, 5.5, 14, or 15 hereof, in which case such paragraphs shall govern the refund of the Deposit, or (ii) there is a failure of a condition precedent for the benefit of Buyer which is not caused by the conduct of Buyer (excluding exercises of discretion by Buyer specifically provided for in this Agreement) and has not been waived by Buyer, in which case the Deposit shall be promptly returned to Buyer and Buyer shall promptly deliver to Seller the Seller Documents and Buyer's Information (as both such terms are hereafter defined). If Buyer purchases the Purchased Assets, any Deposit then on deposit with Escrow Agent shall be credited for the benefit of the Buyer against the Cash Purchase Price at Closing.

4.4   Independent Consideration. Concurrently with the execution of this Agreement, Buyer shall pay and deliver to Seller the sum of Five Hundred Dollars ($500) as separate and independent consideration (the "Independent Consideration") for Seller's execution of this Agreement and agreement to sell the Purchased Assets to Buyer on and subject to the terms and conditions of this Agreement, including, without limitation, the grant to Buyer of the right to conduct its due diligence investigation of the Purchased Assets and the grant to Buyer of the right to terminate this Agreement prior to the expiration of the Inspection Period in connection with such due diligence investigation. The Independent Consideration is not applicable to the Purchase Price and is non-refundable to Buyer in the event this Agreement terminates prior to the Closing hereunder.

## 5.   Buyer's Investigations.

5.1   Inspection of Purchased Assets. Buyer and its authorized agents and representatives shall have reasonable access to the Purchased Assets at all reasonable times during normal business hours (or at such other times as Seller may approve) to inspect and conduct such tests, investigations and analyses reasonably required by Buyer, provided that all invasive or intrusive inspections or tests of the physical condition of the Purchased Assets shall be subject to Seller's approval as set forth below. Such entry and inspections may be conducted

11

only during the period ("Inspection Period") ending at 5:00 p.m. Pacific Time on the date that is thirty (30) days after the Effective Date (the "Inspection Period Expiration Date"), provided, however, that Buyer shall have the right to extend the Inspection Period and the Inspection Period Expiration Date to 5:00 p.m. Pacific time on the date that is fifteen (15) days after the Inspection Period Expiration Date by giving written notice to Seller of its election to exercise such extension right no later than 5:00 p.m. Pacific Time on the date that is five (5) business days prior to the then Inspection Period Expiration Date. Buyer shall provide reasonable prior notice to Seller of its desire, or the desire of its agents or representatives, to enter the Real Property, and Seller shall have the right to have a representative present during any or all tests, investigations and analyses undertaken by or on behalf of Buyer. Buyer shall bear the cost of all inspections, tests, investigations and analyses and may, at its election, take split samples. Prior to performing any invasive or intrusive inspections or tests on the Purchased Assets, Buyer shall (a) obtain Seller's written approval with respect to the scope of work intended to be performed, which approval may be given, conditioned or withheld in Seller's sole and absolute discretion, and (b) provide Seller an opportunity to confer, either directly or through Seller's environmental consultants, with Buyer's environmental consultants in order to determine whether to permit any sampling or testing of surface or subsurface soils, surface water or ground water (and with respect thereto Seller shall have complete and absolute discretion to grant or withhold its consent) or to refine the scope of the work to be performed. During the Inspection Period, and until the earlier of the expiration of the Inspection Period or the termination of this Agreement Seller may continue to market the Purchased Assets for sale or otherwise solicit or entertain any backup offers, but will not enter into any contract, to sell the Purchased Assets.

      5.2    Inspection of Documents. Within two (2) Business Days after the Effective Date, Seller shall make available to Buyer at 901 Encinal Canyon Road, Malibu, CA. 90265 or at 2400 Wyandotte Street, Suite B-102, Mountain View, CA 94043, copies of all records, reports, surveys, plans and specifications, title documents, governmental approvals, leases, inspections, third-party marketing studies, third-party appraisals (with all information regarding the value of the Purchased Assets redacted if Seller so desires), inspections, studies and reports (including, without limitation, inspections, studies and reports regarding the condition of the Purchased Assets), books, records and other documents pertaining to the Purchased Assets in Seller's possession or under Seller's immediate control ((collectively, the "Seller Documents"); provided, however, that Seller shall not be required to so make available (and the Seller Documents shall not include) any internal financial projections made by or on behalf of any of the Seller, internal marketing studies, internal appraisals, or documents or writings that are confidential or protected by the attorney-client privilege. Except as otherwise set forth in Paragraph 12.1 hereof, Seller makes no representation or warranty as to the Seller Documents. Additionally within fifteen (15) days after the Effective Date Seller shall deliver an executed "Natural Hazard Disclosure Statement" in the form required by California law. The information contained in the Natural Hazard Disclosure Statement is a disclosure only for purposes of statutory compliance, and is compiled from, and based solely on, the information sources identified in the Natural Hazard Disclosure Statement. The delivery of the Natural Hazard Disclosure Statement is not intended to be part of any contract between Seller and Buyer or to constitute a representation by Seller to Buyer or to limit or restrict in any way the representations, warranties and agreements of Seller set forth herein, or to give rise to any other rights in Buyer under this Agreement.

5.3    Title Review.

5.3.1    Within seven (7) days after the Effective Date or as soon thereafter as it can be obtained from the Title Company, Seller shall provide Buyer with an updated current preliminary report for the Land (the "Preliminary Report") issued by First American Title Insurance Company (in its capacity as title insurer, the "Title Company"), together with copies of all of the exceptions to title shown thereon.  As used herein, the term "Title Objection Period" shall mean the period ending at 5:00 p.m. Pacific Time on the fifth (5th) day prior to the Inspection Period Expiration Date.  Any exceptions to title listed in the Preliminary Report which are not objected to by Buyer by delivery of written notice to Seller within the Title Objection Period shall be conclusively deemed to be acceptable to Buyer.  In the event Buyer timely objects in writing (a "Title Objection") to any exception to title listed in the Preliminary Report (each matter objected to, an "Objectionable Title Matter") Buyer shall specify in reasonable detail any action required to cure the same.  Seller may, but notwithstanding anything in this Agreement to the contrary shall not be obligated under any circumstances to, cure any Title Objection; provided, however, if Seller is able and willing to eliminate or cure such Title Objection, Seller shall notify Buyer in writing by 5:00 p.m. Pacific Time on the fifth(5th) day after receipt of the Title Objection ("Seller's Notice Period") of such facts (said notice hereinafter called "Seller's Title Notice") and in which case the elimination or curing of the Title Objection shall be a condition to the Closing for the benefit of Buyer.  Seller's failure to deliver Seller's Title Notice to Buyer within Seller's Notice Period shall constitute written notice from Seller that it is unable or unwilling to cure the Title Objection(s).  In the event Seller (i) does not deliver Seller's Title Notice, or (ii) gives Buyer written notice that Seller is unable or unwilling to cure any Title Objection, Buyer shall be deemed to have waived the Title Objection unless within five (5) days following the expiration of Seller's Notice Period, Buyer delivers to Seller written notice terminating this Agreement.  Notwithstanding anything herein to the contrary, in the event that Buyer's right to terminate this Agreement pursuant to any provision of Paragraph 5.3 hereof has not expired prior thereto, it shall expire upon expiration of the Inspection Period.

5.3.2    As used in this Agreement, the term "Permitted Exceptions" shall mean (A) matters caused by the actions of Buyer or its officers, directors, employees, representatives, agents or contractors; (B) all matters shown listed in the Preliminary Report as either exceptions or exclusions, and any other matters reflected on the Preliminary Report to which Buyer does not raise a Title Objection within the Title Objection Period or, having objected, Buyer waives or is deemed to have waived in accordance with the provisions of Paragraph 5.3 hereof; (C) such matters as would be disclosed by an ALTA Survey of the Real Property if Buyer does not obtain such a survey prior to the end of the Inspection Period or such matters as are disclosed by an ALTA Survey of the Real Property if one is obtained by Buyer; (D) any title or survey matter other than an Objectionable Title Matter; (F) zoning, platting, subdivision, building and other municipal codes, ordinances, rules and regulations affecting the Real Property; and (G) real property taxes and assessments for the fiscal year in which the Closing occurs and subsequent years and special district assessments and other special assessments, not yet due and payable.  Notwithstanding the foregoing, Buyer and Seller acknowledge that although Seller has no obligation to cure any title matters (whether or not the same constitute a Title Objection and whether or not Seller notifies Buyer that it is willing to eliminate or cure a title matter), subject to Buyer's full performance hereunder, Seller does agree to deliver title to the Property at Closing free and clear of any and all (i) liens of any deeds of trust, mortgages or other security interests

13

affecting the Property and created by Seller, (ii) liens for delinquent real property tax or assessments, (iii) choate mechanics liens arising out of work or improvements at the Real Property ordered or authorized by Seller, (iv) judgment liens against Seller, and (v) other encumbrances voluntarily placed against the Purchased Assets by Seller and which can be cured by the payment of money (collectively "Seller Monetary Liens"). Seller's removal of all Seller Monetary Liens prior to Closing shall be an express condition precedent to Closing for the benefit Buyer.

5.3.3    Seller agrees that, regardless of whether Buyer shall have furnished to Seller any notice of a Title Objection pursuant to the provisions of Paragraph 5.3.1 hereof, Buyer may, or at any time prior to Closing, further notify Seller in writing of any defects in title first arising after the effective date of the Preliminary Report. Seller shall have the same obligations with respect to any defects in title set forth in such further notice, and Buyer shall have the same rights, as those which apply to any notice of a Title Objection, provided under Paragraph 5.3.1 above. The last date for Closing under this Agreement shall be extended if and to the extent necessary to allow the same periods of time for responding to any such further notice of defects in title pursuant to Paragraph 5.3.3, as are provided with respect to any original notice of a Title Objection pursuant to Paragraph 5.3.1 above; provided, however, that without the prior written consent of Buyer, the last date for Closing may not be extended for more than fifteen (15) days. At the end of such fifteen (15)-day period, this Agreement shall terminate unless such period is extended pursuant to the prior written consent of Buyer.

5.4    Inspection Obligations.

5.4.1    In conducting any inspections, investigations or tests of the Purchased Assets and/or Documents, Buyer and its agents and representatives shall: (i) not disturb Seller or interfere with its use of the Purchased Assets; (ii) not interfere with the operation and maintenance of the Purchased Assets; (iii) not physically damage any part of the Purchased Assets or any personal property owned or held by Seller or any third party; (iv) not cause bodily harm to Seller, or its agents, guests, invitees, contractors or employees; (v) maintain comprehensive general liability insurance on an occurrence basis, including property damage, bodily injury and death coverage, with limits of One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate, and covering any accident arising in connection with the presence of Buyer, its agents and representatives on the Real Property, which insurance shall be issued by an insurer with a rating of at least A- VII by AM Best, shall be primary insurance, and not excess over or contributory with any other insurance in force for or on behalf of Seller, and shall name Seller and such additional parties as Seller shall designate as additional insureds; (vi) promptly pay when due the costs of all tests, investigations, and examinations done with regard to the Purchased Assets; (vii) not permit any liens to attach to the Purchased Assets by reason of the exercise of its rights hereunder; and (viii) fully restore the Land and the Improvements to the condition in which the same was found before any such inspection or tests were undertaken.

5.4.2    Buyer hereby indemnifies and agrees to indemnify, defend and hold Seller and all of its officers, directors, agents, employees, attorneys, representatives and contractors, harmless from and against any and all liens, claims, causes of action, damages, liabilities and expenses (including reasonable attorneys' fees) arising out of the activity of Buyer or its

14

contractors or representatives in connection with Buyer's inspections or tests permitted hereunder or any violation of the provisions of this Paragraph 5; provided, however, that in no event shall Buyer be obligated to so indemnify Seller and its officers, directors, agents, employees, attorneys, representatives, or contractors to the extent any such liens, claims, causes of action, damages, liabilities, or expenses arise from the discovery of any pre-existing condition affecting the Purchased Assets or any damage caused by such conditions. Notwithstanding any provision of this Agreement, no termination hereof shall terminate Buyer's obligations pursuant to this Paragraph, which obligations shall survive any termination or expiration of this Agreement (notwithstanding anything to the contrary contained in any other provision of this Agreement), and the limitation of damages as set forth in Paragraph 16.1 shall not be applicable to any cause of action arising pursuant to Paragraph 5.3 or this Paragraph 5.4.2.

      5.5    <u>Right of Termination</u>. During the Inspection Period, Buyer shall be entitled, as its sole remedy (other than the remedies provided for in Paragraph 16.2 hereof with respect to a default by Seller in the performance of its obligations hereunder), to terminate this Agreement, for any reason or no reason at all, by giving written notice ("<u>Termination Notice</u>") to be received by Seller at or before 5:00 p.m. Pacific Time on the last day of the Inspection Period, whereupon all of the provisions of this Agreement (except those provisions which expressly survive the termination of this Agreement, which provisions are hereinafter collectively referred to as the "<u>Surviving Terms</u>") shall terminate. Upon such termination, neither Seller nor Buyer shall have any further obligation or liability to the other hereunder, except with respect to the Surviving Terms. Upon such termination, the Deposit shall be promptly returned to Buyer, and Buyer shall promptly deliver to Seller the Documents and Buyer's Information. Notwithstanding anything to the contrary contained herein, if the Buyer does not deliver the Termination Notice as and when required hereunder, Buyer shall nonetheless be deemed to have elected to terminate this Agreement.

      5.6    <u>Confidentiality</u>. Buyer acknowledges and agrees that it will keep confidential the Seller Documents and the contents thereof, and any documents and information obtained by Buyer concerning the Purchased Assets and the Documents, and Buyer agrees that without the prior written authorization of Seller it shall not disclose or otherwise use any Confidential Information (defined below) other than to partners, officers, directors, employees, attorneys, accountants, lenders or potential lenders, investors or potential investors, legal counsel, representatives, agents or contractors (in each case, actual or prospective of either Buyer or Seller who are directly involved in the purchase and sale transaction contemplated hereby or pursuant to a court order), provided that the Confidential Information shall only be confidential until Buyer's acquisition of the Purchased Assets. (The documents and information described in the two immediately preceding sentences which are to be kept confidential by Seller and Buyer, respectively, are hereinafter referred to collectively as the "<u>Confidential Information</u>".) Notwithstanding anything to the contrary set forth herein, in no event shall Confidential Information include (i) any information which is or becomes publicly known other than a result of disclosure by any person or entity in violation of this Agreement, or (ii) any information that was known or becomes known to Buyer on a non-confidential basis from any person or entity; provided that, to Buyer's knowledge, such source is not prohibited from disclosing such information to Buyer pursuant to a confidentiality agreement or the provisions of this Paragraph 5.6. Each party shall inform any of its partners, officers, directors, employees, attorneys, lenders or potential lenders, investors or potential investors, representatives, agents or contractors to

whom any Confidential Information is provided of the requirements of this Paragraph and shall use commercially reasonable efforts to ensure that its partners, officers, directors, employees, attorneys, lender, investors, representatives, agents and contractors will likewise conform to the covenant of confidentiality set forth herein as to any Confidential Information which such party provides to them; and Seller will ensure that any of its partners, officers, directors, employees, attorneys, lenders, investors, representatives, agents and contractors will likewise conform to the covenant of confidentiality set forth herein as to any Confidential Information which Seller provides to them.  If either Buyer or Seller receives a legal request to disclose Confidential Information, such party will immediately notify the other.  In the event Buyer or Seller becomes legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigation or demand or similar process or by law) to disclose any Confidential Information, such party will provide the other with prompt prior written notice of such requirement so that such other party may seek a protective order or other appropriate remedy and/or waive compliance with the terms of this Agreement.  In the event that such protective order or other remedy is not obtained or that the protected party waives compliance with the provisions of this Agreement, the other party agrees to furnish only that portion of the Confidential Information such party is advised by written opinion of counsel as legally required to be furnished and shall exercise good faith efforts to obtain assurance that confidential treatment will be accorded the information provided.  Notwithstanding the foregoing, either party may disclose Confidential Information in connection with any litigation among the Parties hereto.

        (a)    <u>Return of Seller Documents</u>.  Buyer shall return (i) all of the Seller Documents, (ii) any and all copies Buyer has made of the Seller Documents, and (iii) so long as Seller is not in default of its obligation hereunder to convey title to the Purchased Assets to Buyer, all copies of any studies, reports or test results obtained by Buyer in connection with its inspection of the Purchased Assets (collectively, "<u>Buyer's Information</u>"), at such time as this Agreement is terminated for any reason.

        (b)    <u>No Representation or Warranty</u>.  Buyer hereby acknowledges that, except as expressly set forth herein:  (i) Seller has not made and does not make any warranty or representation regarding the truth, accuracy or completeness of the Seller Documents or the source(s) thereof; (ii) Seller has not undertaken any independent investigation as to the truth, accuracy or completeness of the Seller Documents; and (iii) Seller is providing the Documents solely as an accommodation to Buyer.  Except as otherwise expressly set forth herein, Buyer covenants, represents and warrants that Seller shall not have any liability to Buyer nor any of its partners, members, lenders, property managers, officers, employees or representatives in any manner arising from the use of or reliance on the Seller Documents by Buyer or its partners, members, lenders, property managers, officers, employees, lenders, agents or representatives. Seller hereby acknowledges that:  (i) Buyer has not made and does not make any warranty or representation regarding the truth, accuracy or completeness of the Buyer's Information or the source(s) thereof; (ii) Buyer has not undertaken any independent investigation as to the truth, accuracy or completeness of the Buyer's Information; and (iii) Buyer, if required to do so under this Agreement, will be providing the Buyer's Information solely as an accommodation to Seller. Seller covenants, represents and warrants that Buyer shall not have any liability to Seller nor any of its partners, members, lenders, property managers, officers, employees or representatives in any manner arising from the use of or reliance on the Buyer's Information Seller's by Seller or

its partners, members, lenders, property managers, officers, employees, lenders, agents or representatives.

6.      **Buyer's Conditions Precedent**.

6.1      <u>Buyer's Conditions Precedent</u>. Buyer's obligation to purchase the Purchased Assets from Seller is subject to fulfillment or waiver by Buyer of the following conditions precedent (the "<u>Buyer Conditions Precedent</u>"):

6.1.1    The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order.

6.1.2    The Title Company shall have irrevocably committed to issue, on the Closing Date and upon the sole condition of the payment of its regularly scheduled premium, an ALTA extended coverage owner's policy of title insurance (the "<u>Title Policy</u>"), insuring Buyer in the amount of the Cash Purchase Price that title to the Real Property is vested of record in Buyer as of the Close of Escrow subject only to the Permitted Exceptions.

6.1.3    Seller shall have performed, in all material respects, each and every obligation contained in this Agreement to be performed by Seller within the time periods applicable thereto;

6.1.4    On the Closing Date, all representations and warranties made by Seller in Paragraph 12 hereof shall be true and correct in all material respects.

7.      **Seller's Conditions Precedent**.

7.1      <u>Seller's Conditions Precedent</u>.  Seller's obligation to sell the Purchased Assets to Buyer is subject to fulfillment or waiver by Buyer of the following conditions precedent (the "<u>Seller Conditions Precedent</u>"):

7.1.1    The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order.

7.1.2    Buyer shall have performed, in all material respects, each and every obligation contained in this Agreement to be performed by Buyer within the time periods applicable thereto; and

7.1.3    On the Closing Date, all representations and warranties made by Buyer in Paragraph 12.2 hereof shall be true and correct in all material respects.

8.      **Escrow**.

8.1      <u>Escrow</u>.  Buyer and Seller shall establish an escrow ("<u>Escrow</u>") with the Escrow Agent for the close of this transaction.  An executed copy of this Agreement shall be deposited with the Title Company by Buyer, and this Agreement, together with , Seller's Additional Escrow Instructions (as hereinafter defined), if any, and Buyer's Additional Escrow Instructions

17

(as hereinafter defined), if any, shall constitute the Title Company's escrow instructions for closing Escrow. Escrow shall close ("Close of Escrow") on or before the Closing Date.

8.2    Seller. No later than one (1) day prior to the Closing Date Seller shall deposit the following into Escrow:

8.2.1    Deed. A duly executed and acknowledged grant deed (the "Deed") conveying fee title to the Real Property, subject only to the Conditions of Title, from Seller to Buyer in the form attached hereto as Exhibit C;

8.2.2    Sale Order. A certified copy of the Sale Order entered on the docket in the Bankruptcy Case;

8.2.3    Bill of Sale. A duly executed Bill of Sale, Assignment and Assumption (the "Bill of Sale") in the form attached hereto as Exhibit D;

8.2.4    Non-Foreign Person Certificates. Duly executed non-foreign person certificates ("Non-Foreign Person Certificates") in usual form sufficient to relieve Buyer of any withholding requirements pursuant to the provisions of Section 1445 of the Internal Revenue Code of 1954 as amended and Section 18662 of the California Revenue and Taxation Code (to the extent Seller cannot or does not deposit such Non-Foreign Person Certificates into Escrow, Buyer and the Title Company shall be authorized to withhold from the Cash Purchase Price and remit to the Internal Revenue Service and/or California Franchise Tax Board, as applicable, the amount required to be withheld pursuant to such sections and regulations promulgated pursuant thereto); and

8.2.5    Additional Escrow Instructions and Documents. Such additional escrow instructions ("Seller's Additional Escrow Instructions") and documents ("Seller's Additional Documents") as the Title Company may reasonably require of Seller to close this transaction in accordance with this Agreement.

8.3    Buyer. No later than the Closing Date Buyer shall deposit the following into Escrow:

8.3.1    Cash Purchase Price and Additional Cash. The Cash Purchase Price, as increased by the closing costs provided for in 9.3 hereof and as increased or decreased by the prorations provided for in Paragraph 9.4 hereof;

8.3.2    Bill of Sale. A duly executed counterpart of the Bill of Sale;

8.3.3    Change of Ownership Report. A duly executed Preliminary Change of Ownership Report; and

8.3.4    Additional Escrow Instructions and Documents. Such additional escrow instructions ("Buyer's Additional Escrow Instructions") and documents ("Buyer's Additional Documents") as the Title Company may reasonably require of Buyer to close this transaction in accordance with this Agreement.

18

9.    **Close of Escrow**.

9.1    Time.  If the Sale Order is entered then, Escrow shall close on the date which is thirty (30) days after the date upon which the Sale Order becomes a Final Order, (the "Closing Date").

9.2    Closing Procedures.  On the Closing Date the Escrow Agent shall close the Escrow (the "Closing") by following the following procedures:

9.2.1    It shall record the Deed in the Official Records of Los Angeles County, California.

9.2.2    It shall deliver to Seller the following:

(a)    The Cash Purchase Price, adjusted for the prorations as hereinafter set forth and such Additional Cash amounts as are required by Paragraph 3.2 hereof ;

(b)    A certified copy of the recorded Deed;

(c)    An original of the Bill of Sale ; and

(d)    A copy of all other documents which were delivered into the Escrow by Buyer or Seller.

9.2.3    It shall deliver to Buyer the following:

(a)    A certified copy of the recorded Deed;

(b)    The original Bill of Sale;

(c)    The Non Foreign Person Certificates;

(d)    The Title Policy; and

(e)    A copy of all other documents which were delivered into the Escrow by Buyer or Seller.

9.2.4    It shall pay to any counterparty on an Assumed Contract the monetary cure amounts which are required to be paid in the order for Seller to assume the Assumed Contracts within the meaning of Section 365 of the Bankruptcy Code (collectively, the "Cure Amounts") relating to any Assumed Contracts shall be paid directly from Escrow in the amount as approved by the Bankruptcy Court in the Sale Order. Seller shall give sufficient notice to all parties to the Assumed Contracts to which Cure Amounts may be due in sufficient time to allow such parties to make timely demand upon escrow for payment of said Cure Amounts.

9.3    Closing Costs.  Seller shall pay (i) all transfer taxes due in connection with the conveyance of the Purchased Assets, (ii) the base premium of the Title Policy, (iii) all recording fees, and (iv) one-half of all escrow fees payable to Escrow Agent.  Buyer shall pay for all other closing costs, including, without limitation, (i) all title insurance costs and fees in excess of the

19

cost of the base standard owner's coverage, including any for extended coverage, endorsements, coinsurance or reinsurance, and any loan policy charges, (ii) the cost of any ALTA survey which Buyer elects to obtain, and (iii) one-half (½) of all escrow fees payable to Escrow Agent.

9.4    Prorations.  All current, non-delinquent real property taxes and assessments for the current year in which the Escrow is closed (based on the latest available assessment and rate), rents and other income, and utility and sewer service charges, shall be adjusted and prorated between Buyer and Seller and shall be prorated as of 12:01 a.m. on the Closing Date on the basis of the actual number of days in the month and year during which the Escrow closes.  If the actual amount of costs and expenses to be so prorated is not known as of the Closing Date, the proration shall be based as to such items such on the most accurate information or estimates then available to Seller and thereafter, when actual figures are received (but in no event later than one hundred twenty (120) days after the Closing Date) a re-proration will be made on the basis of actual figures and a final cash settlement will be made between Buyer and Seller.

9.5    Survival.  The provisions of Paragraph 9.3 and Paragraph 9.4 hereof shall survive the Closing of the Escrow.

**10.    Possession.**

10.1    Possession.  Sole and exclusive possession of the Purchased Assets, free and clear of the claims or rights of any third parties shall be delivered to Buyer by Seller at the Close of Escrow.

**11.    Brokers and Commission.**

11.1    Brokers and Commission.  Subject to the terms of the Sale Procedures Order and approval by the Bankruptcy Court, Seller shall pay any real estate and other commissions to Seller's real estate and loan brokers, including, without limitation, those owed to Collier's International in the amount not to exceed 1.5% of the Purchase Price ("Seller's Broker") and Venturi & Company LLC, a _____ limited liability company, in the amount not to exceed 1.5% of the Purchase Price ("Buyer's Broker" if any) at Closing.  Other than as stated in the previous sentence, Seller and Buyer each represent and warrant to the other that no real estate brokerage commission or finder's fee is payable to any other person or entity in connection with the transaction contemplated hereby, and each agrees to and does hereby indemnify and hold the other harmless against the payment of any commission or finder's fee to any person or entity claiming a brokerage commission or finder's fee by reason of the agreement, express or implied, of such party.  This indemnification shall extend to any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees and litigation costs) arising as a result of such claims and shall survive the Closing.

**12.    Representations and Warranties.**

12.1    Seller's Representations and Warranties.  Seller hereby makes the following representations and warranties to Buyer, which representations and warranties are true and correct in all material respects as of the Effective Date.  All representations and warranties of Seller under this Agreement shall survive the Close of Escrow for a period of one (1) year thereafter, and any claim that Buyer may have against Seller for breach of any such

20

representation or warranty, whether known or unknown, that is not asserted by written notice given by Buyer to Seller on or before the expiration of such one (1) year period shall not be valid or effective thereafter, and no action or other proceeding may be maintained to seek damages for breach thereof or any other relief occasioned thereby. As used herein, the phrase "Seller's Knowledge," "known to Seller," and "Seller has no Knowledge" shall mean to the actual knowledge of Thomas C. Hix, the president of Seller's  Co-Managing Member, without any duty of investigation or inquiry for the purpose of making such representation and warranty and without having reviewed or having any duty to have reviewed the Seller Documents.

12.1.1  Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of California.

12.1.2  Seller has the authority to enter into this Agreement and to own and convey the Purchased Assets.  This Agreement has been, and all documents executed by Seller which are to be delivered to Buyer on the Closing Date shall be, duly authorized, executed and delivered by Seller.  No further actions, approvals or authorization on Seller's part are or will be required in order to enable Seller to consummate the transactions contemplated by this Agreement.

12.1.3  Seller is a United States person and is not a foreign corporation, foreign partnership, foreign trust or foreign estate, as those terms are defined in the Internal Revenue Code of 1954 as amended and is a limited liability company which is not a disregarded entity for federal or state income tax purposes.

12.1.4  The copies of the Seller Documents delivered to Buyer by or on behalf of Seller are complete copies of the documents in Seller's possession and to the Seller's knowledge are true, accurate and all of the documents in Seller's possession or control relating to the Property.

12.1.5  Except for (i) the Bankruptcy Case, and (ii) a lawsuit filed by the Lender in the Los Angeles Superior Court seeking judicial foreclosure and other relief under the First Loan and seeking to collect on personal guarantees of Messrs. Kvamme, Hix and Fuld, and a co-pending non-judicial foreclosure proceedings pursuant to which Lender has noticed a Trustee's Sale date originally scheduled for February 27, 2015 (now stayed due to the Bankruptcy), there are presently no pending actions, suits or proceedings, including without limitation, condemnation, eminent domain or similar proceedings against Seller which affect the Real Property or any portion thereof with respect to which Seller has been served with process or other notice thereof nor, to Seller's Knowledge, are any such actions, suits or proceedings otherwise pending or threatened.

12.1.6  There is presently no pending condemnation, eminent domain or similar proceedings affecting the Purchased Assets or any part thereof with respect to which Seller has been served with process or other notice thereof nor, to Seller's Knowledge, is any such condemnation otherwise pending or contemplated.

12.1.7  To Seller's Knowledge, Seller has received no notice, that the Real Property is in violation of any law, ordinance or regulation;

12.1.8  Except as previously disclosed to Buyer, Seller has no Knowledge of (A) use, presence, or storage of any Hazardous Materials on the Real Property in violation of any laws relating thereto, or (B) any disposal, generation or release of any Hazardous Materials on, from or under the Real Property.  To Seller's Knowledge, Seller has not received written notice from any governmental agency having jurisdiction over the Real Property of a material violation of law with respect to Hazardous Materials (as defined below) on the Real Property.

12.2    Buyer's Representations and Warranties.  Buyer hereby makes the following representations and warranties to Seller, which representations and warranties are true and correct as of the date hereof and shall be true and correct at the Close of Escrow.  All representations and warranties of Buyer under this Agreement shall survive the Close of Escrow for a period of one (1) year thereafter, and any claim that Seller may have against Buyer for breach of any such representation or warranty, whether known or unknown, that is not asserted by written notice given by Seller to Buyer within such one (1) year period shall not be valid or effective thereafter, and no action or other proceeding may be maintained to seek damages for breach thereof or any other relief occasioned thereby.

12.2.1  Buyer is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and qualified to conduct business in California.

12.2.2  Buyer has the authority to enter into this Agreement and to own the Purchased Assets.  This Agreement has been, and all documents executed by Buyer which are to be delivered to Seller on the Closing Date shall be, duly authorized, executed and delivered by Buyer.  No further actions, approvals or authorization on Buyer's part are or will be required in order to enable Buyer to consummate the transactions contemplated by this Agreement.

**13.    "As-Is" Condition.**

13.1    "As-Is" Condition.  Except as expressly provided in this Agreement or in any document signed by Seller and delivered to Buyer at the Closing through Escrow (each a "Closing Document"), Seller makes no representations or warranties of any kind, express or implied, written or oral, as to the condition of all or any portion of the Purchased Assets, either physical or environmental; the uses of the Purchased Assets or any limitations thereon, including, without limitation, zoning, environmental or other laws, regulations or governmental requirements; the utilities or other physical equipment and fixtures on the Real Property, the costs of operating all or any portion of the Purchased Assets or any other aspect of the economic operations thereon; the possibility of future assessments of charges being levied against all or any portion of the Purchased Assets or imposed as a condition to development or construction; or the condition of the soils or groundwaters of the Real Property.  Buyer agrees that with respect to the Purchased Assets, Buyer has not relied upon and will not rely upon, either directly or indirectly, any representation or warranty of Seller except for those representations and/or warranties expressly set forth herein or any representation or warranty of any agent or affiliate of Seller.  Except as provided herein or in any Closing Document, Buyer specifically acknowledges that he is acquiring the Purchased Assets in an "as is" condition, in reliance upon his own inspection and investigation of the Purchased Assets, from public documents and from information obtained from independent third parties; and Buyer has not relied and will not rely in

22

any manner upon any disclosure, representation, warranty, agreement or understanding, express or implied, made by Seller or any of Seller's employees, representatives or agents, except as specifically and expressly stated in this Agreement or in any Closing Document. Buyer and Seller both acknowledge and agree that Buyer's right to inspect, investigate and make inquiries concerning the Purchased Assets, the specific terms of the express warranties, representations and covenants contained in this Agreement and in the Closing Documents, and the specific disclosures by Seller contained herein were all essential factors relied upon by Seller in agreeing to the Purchase Price and entering into this Agreement. Buyer expressly agrees that the terms and conditions of this Section shall survive the closing and not merge therein and Seller is not liable or bound in any manner by any verbal or written statements, representations or information pertaining to the Purchased Assets furnished by any real estate broker, agent, employee, servant or other person, unless the same are specifically set forth in this Agreement.

14.     **Risk of Loss**.

14.1    Buyer's Termination Right. If before the Close of Escrow, the Improvements are damaged or destroyed by a fire or other casualty, Seller shall notify Buyer of such damage or destruction immediately following learning of such damage or destruction and, except as hereinafter provided, Buyer shall have the right to elect, by giving written notice to Buyer at or before 5:00 p.m. Pacific Time on the date which is five (5) Business Days after Seller notifies Buyer of such casualty (the "Termination Period"), to either (i) require Seller to repair such damage or destruction, or (ii) terminate this Agreement. Buyer's failure to give written notice to Seller prior to the expiration of the Termination Period that Buyer elects to not terminate this Agreement shall be deemed to constitute Buyer's election to terminate this Agreement. If this Agreement terminates pursuant to this Paragraph 14.1, neither Seller nor Buyer shall have any further obligations under this Agreement (except with respect to those provisions of this Agreement which expressly survive such termination). If this Agreement does not so terminate pursuant to this Paragraph 14.1, then Seller shall proceed diligently, at its sole expense, repair such damage or destruction and the Close of Escrow shall be delayed until such repair is completed, and Buyer at the Close of Escrow shall acquire the Purchased Assets for the Purchase Price without adjustment.

14.2    Notwithstanding the provisions of Paragraph 14.1 above, if before the Close of Escrow, the Improvements are damaged or destroyed by a fire or other casualty and the cost of the repair or restoration is fully covered by insurance then carried by Seller (except to the extent of the deductible under such insurance, then Buyer's shall not have the right to so terminate this Agreement and the rights and obligations of the Parties shall not be affected thereby and Seller shall assign Seller's right in and to all insurance proceeds payable in connection with such damage to Buyer at the Closing and the Cash Purchase Price shall be reduced by the amount of any deductible payable under such insurance.

15.     **Condemnation**.

15.1    Condemnation. If prior to Close of Escrow, a portion of the Purchased Assets is taken by eminent domain (or an action of eminent domain has been commenced against all or any portion of the Purchased Assets) and such taken will have a material, adverse effect upon the use, ownership or operation of the Purchased Assets, then upon Seller's receipt of notice thereof

23

Seller shall promptly notify Buyer of such fact and Buyer shall have the option to terminate this Agreement upon notice to Seller given not later than ten (10) days after receipt of Seller's notice. If Buyer shall elect to terminate this Agreement pursuant to this provision, this Agreement shall terminate and Buyer and Seller shall have no further rights, duties or obligations hereunder, save and except for any duties or obligation to indemnify the other pursuant to the provisions hereof (which duties or obligations of indemnification shall survive such termination). If Buyer does not exercise such option to terminate this Agreement, neither Buyer nor Seller shall have the right to terminate this Agreement, but Seller shall assign and turn over to Buyer at Close of Escrow, and Buyer shall be entitled to negotiate for, receive, and keep, all awards, and rights to receive future awards, for such taking by eminent domain and the transaction contemplated by this Agreement shall be consummated pursuant to the terms hereof, without any reduction of the Purchase Price.

16.    **Remedies**.

    16.1    Seller's Remedies; Liquidated Damages.  IN THE EVENT THAT THIS AGREEMENT DOES NOT TERMINATE PRIOR TO THE  INSPECTION PERIOD EXPIRATION DATE AS PROVIDED HEREIN AND THE CLOSING DOES NOT OCCUR FOR ANY REASON OTHER THAN A DEFAULT BY SELLER IN THE PERFORMANCE OF ITS OBLIGATIONS HEREUNDER OR THE FAILURE (THROUGH NO FAULT OF BUYER OR BUYER'S AGENTS, EMPLOYEES OR REPRESENTATIVES), OF A CONDITION PRECEDENT FOR THE BENEFIT OF BUYER SET FORTH HEREIN, SELLER SHALL BE ENTITLED TO TERMINATE THIS AGREEMENT AND SHALL BE PAID THE DEPOSIT AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY OR FORFEITURE, IN SATISFACTION OF CLAIMS AGAINST BUYER HEREUNDER. SELLER AND BUYER AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT OR IMPOSSIBLE TO FIX THE ACTUAL DAMAGES SUFFERED BY SELLER AS A RESULT OF BUYER'S FAILURE TO COMPLETE THE PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THIS AGREEMENT. THE PARTIES FURTHER AGREE THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE HEREOF, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS PARAGRAPH 16.1 REPRESENT THE PARTIES' BEST ESTIMATE OF THE DAMAGES WHICH SELLER WOULD INCUR AS A RESULT OF SUCH FAILURE. NOTWITHSTANDING THE FOREGOING SENTENCE, THE SURVIVING TERMS SHALL SURVIVE ANY SUCH TERMINATION.

Buyer:                              Seller:

_____                    _____

    16.2    Buyer's Remedies.  In the event Seller shall default in the performance of any of its obligations hereunder, Buyer shall elect, as its sole remedy, either (i) to terminate this Agreement by giving Seller timely written notice of such election prior to or at Closing, and recover the Deposit and all out-of-pocket costs and expenses incurred by Buyer in connection with this Agreement and the inspection of the Purchased Assets in an amount not to exceed One Hundred Thousand Dollars ($100,000), in which event Buyer and Seller shall have no further

24

Seller shall promptly notify Buyer of such fact and Buyer shall have the option to terminate this Agreement upon notice to Seller given not later than ten (10) days after receipt of Seller's notice. If Buyer shall elect to terminate this Agreement pursuant to this provision, this Agreement shall terminate and Buyer and Seller shall have no further rights, duties or obligations hereunder, save and except for any duties or obligation to indemnify the other pursuant to the provisions hereof (which duties or obligations of indemnification shall survive such termination). If Buyer does not exercise such option to terminate this Agreement, neither Buyer nor Seller shall have the right to terminate this Agreement, but Seller shall assign and turn over to Buyer at Close of Escrow, and Buyer shall be entitled to negotiate for, receive, and keep, all awards, and rights to receive future awards, for such taking by eminent domain and the transaction contemplated by this Agreement shall be consummated pursuant to the terms hereof, without any reduction of the Purchase Price.

## 16.    Remedies.

16.1    Seller's Remedies; Liquidated Damages. IN THE EVENT THAT THIS AGREEMENT DOES NOT TERMINATE PRIOR TO THE  INSPECTION PERIOD EXPIRATION DATE AS PROVIDED HEREIN AND THE CLOSING DOES NOT OCCUR FOR ANY REASON OTHER THAN A DEFAULT BY SELLER IN THE PERFORMANCE OF ITS OBLIGATIONS HEREUNDER OR THE FAILURE (THROUGH NO FAULT OF BUYER OR BUYER'S AGENTS, EMPLOYEES OR REPRESENTATIVES), OF A CONDITION PRECEDENT FOR THE BENEFIT OF BUYER SET FORTH HEREIN, SELLER SHALL BE ENTITLED TO TERMINATE THIS AGREEMENT AND SHALL BE PAID THE DEPOSIT AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY OR FORFEITURE, IN SATISFACTION OF CLAIMS AGAINST BUYER HEREUNDER. SELLER AND BUYER AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT OR IMPOSSIBLE TO FIX THE ACTUAL DAMAGES SUFFERED BY SELLER AS A RESULT OF BUYER'S FAILURE TO COMPLETE THE PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THIS AGREEMENT. THE PARTIES FURTHER AGREE THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE HEREOF, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS PARAGRAPH 16.1 REPRESENT THE PARTIES' BEST ESTIMATE OF THE DAMAGES WHICH SELLER WOULD INCUR AS A RESULT OF SUCH FAILURE. NOTWITHSTANDING THE FOREGOING SENTENCE, THE SURVIVING TERMS SHALL SURVIVE ANY SUCH TERMINATION.

Buyer:                                                    Seller:

_____                                _____

16.2    Buyer's Remedies. In the event Seller shall default in the performance of any of its obligations hereunder, Buyer shall elect, as its sole remedy, either (i) to terminate this Agreement by giving Seller timely written notice of such election prior to or at Closing, and recover the Deposit and all out-of-pocket costs and expenses incurred by Buyer in connection with this Agreement and the inspection of the Purchased Assets in an amount not to exceed One Hundred Thousand Dollars ($100,000), in which event Buyer and Seller shall have no further

24

Seller shall promptly notify Buyer of such fact and Buyer shall have the option to terminate this Agreement upon notice to Seller given not later than ten (10) days after receipt of Seller's notice. If Buyer shall elect to terminate this Agreement pursuant to this provision, this Agreement shall terminate and Buyer and Seller shall have no further rights, duties or obligations hereunder, save and except for any duties or obligation to indemnify the other pursuant to the provisions hereof (which duties or obligations of indemnification shall survive such termination).  If Buyer does not exercise such option to terminate this Agreement, neither Buyer nor Seller shall have the right to terminate this Agreement, but Seller shall assign and turn over to Buyer at Close of Escrow, and Buyer shall be entitled to negotiate for, receive, and keep, all awards, and rights to receive future awards, for such taking by eminent domain and the transaction contemplated by this Agreement shall be consummated pursuant to the terms hereof, without any reduction of the Purchase Price.

## 16.    Remedies.

16.1    Seller's Remedies; Liquidated Damages.  IN THE EVENT THAT THIS AGREEMENT DOES NOT TERMINATE PRIOR TO THE  INSPECTION PERIOD EXPIRATION DATE AS PROVIDED HEREIN AND THE CLOSING DOES NOT OCCUR FOR ANY REASON OTHER THAN A DEFAULT BY SELLER IN THE PERFORMANCE OF ITS OBLIGATIONS HEREUNDER OR THE FAILURE (THROUGH NO FAULT OF BUYER OR BUYER'S AGENTS, EMPLOYEES OR REPRESENTATIVES), OF A CONDITION PRECEDENT FOR THE BENEFIT OF BUYER SET FORTH HEREIN, SELLER SHALL BE ENTITLED TO TERMINATE THIS AGREEMENT AND SHALL BE PAID THE DEPOSIT AS LIQUIDATED DAMAGES, AND NOT AS A PENALTY OR FORFEITURE, IN SATISFACTION OF CLAIMS AGAINST BUYER HEREUNDER. SELLER AND BUYER AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT OR IMPOSSIBLE TO FIX THE ACTUAL DAMAGES SUFFERED BY SELLER AS A RESULT OF BUYER'S FAILURE TO COMPLETE THE PURCHASE OF THE PURCHASED ASSETS PURSUANT TO THIS AGREEMENT.  THE PARTIES FURTHER AGREE THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE HEREOF, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS PARAGRAPH 16.1 REPRESENT THE PARTIES' BEST ESTIMATE OF THE DAMAGES WHICH SELLER WOULD INCUR AS A RESULT OF SUCH FAILURE. NOTWITHSTANDING THE FOREGOING SENTENCE, THE SURVIVING TERMS SHALL SURVIVE ANY SUCH TERMINATION.

Buyer:                                              Seller:

_____                          _____

16.2    Buyer's Remedies.  In the event Seller shall default in the performance of any of its obligations hereunder, Buyer shall elect, as its sole remedy, either (i) to terminate this Agreement by giving Seller timely written notice of such election prior to or at Closing, and recover the Deposit and all out-of-pocket costs and expenses incurred by Buyer in connection with this Agreement and the inspection of the Purchased Assets in an amount not to exceed One Hundred Thousand Dollars ($100,000), in which event Buyer and Seller shall have no further

24

obligations hereunder (except with respect to the Surviving Terms, which shall survive any such termination) and Seller shall be free to offer the Purchased Assets for sale to third parties, or (ii) to enforce specific performance of the obligations of Seller to deliver the Deed and other closing documents at Closing; provided, however, that prior to termination of this Agreement by Buyer for Seller's default, Buyer shall give Seller written notice thereof, and Seller shall have five (5) Business Days from receipt of Buyer's notice or until the Closing Date, whichever is sooner, to cure such default, and provided further that Seller's failure to close when required hereunder is a default which shall not require any notice nor cure period. Notwithstanding anything herein to the contrary, Buyer shall be deemed to have elected to terminate this Agreement if Buyer fails to commence and serve upon Seller an action for specific performance within sixty (60) days following the then scheduled Closing Date. Buyer's remedies shall be limited to those described in this Paragraph 16.2 or Paragraph 17.3, and Buyer hereby expressly waives and relinquishes any and all rights to pursue any other remedy at law or in equity. Notwithstanding the immediately preceding sentence, if specific performance is not available to Buyer at any time during such sixty (60)-day period following the then scheduled Closing Date solely due to the bad faith, fraud or intentional or willful misconduct of Seller (for example, because prior to Closing, Seller sells the Purchased Assets to a third party without notice of this Agreement), then in such case, in addition to the other remedies described herein, Buyer may file an action to recover its damages as a result of Seller's breach provided that Buyer must commence a "legal action" for damages and serve notice thereof on Seller within sixty (60) days after the earlier of the then scheduled Closing Date or the date on which Buyer first obtained knowledge of Seller's bad faith, fraud or intentional or willful misconduct. IN NO EVENT SHALL SELLER OR ANY OFFICER, DIRECTOR, SHAREHOLDER, MEMBER, PARTNER, EMPLOYEE OR AGENT OF SELLER HAVE ANY LIABILITY, BEYOND ITS INTEREST IN THE PURCHASED ASSETS, FOR ANY CLAIM, CAUSE OF ACTION OR OTHER LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE PURCHASED ASSETS, WHETHER BASED ON CONTRACT, COMMON LAW, STATUTE, EQUITY OR OTHERWISE.

## 17.    **General Provisions**.

17.1    <u>Entire Agreement</u>.  This Agreement contains all of the covenants, conditions and agreements between the Parties and shall supersede all prior correspondence, agreements, and understandings, both oral and written. No provisions of this Agreement may be amended or modified in any manner except by an agreement in writing duly executed by the Parties hereto.

17.2    <u>Governing Law and Jurisdiction</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California as applied to agreements among California residents which are entered into and performed entirely within California. The Parties agree that the Bankruptcy Court shall retain jurisdiction over the interpretation and enforcement of this Agreement including, but not limited to, the performance of the obligations and transactions contemplated hereunder.

17.3    <u>Attorneys' Fees</u>.  If either party fails to perform any of his or its obligations under this Agreement, or if any dispute arises between the Parties concerning the meaning or interpretation of any provision hereof, then the non-prevailing party in any proceeding in connection with such dispute shall pay the costs and expenses incurred by the prevailing party on

account thereof and in enforcing or establishing his or its rights hereunder, including, without limitation, court costs and reasonable attorneys' fees and disbursements.

17.4    <u>Successors and Assigns</u>. The terms, covenants and conditions herein contained shall be binding upon and inure to the benefit of the successors and assigns of the Parties hereto. Notwithstanding the foregoing, Buyer's rights hereunder shall not be assigned without the prior written consent of Seller, which consent Seller shall not unreasonably withhold, condition or delay; provided, however, that Buyer may assign his rights under this Agreement without Seller's approval to any entity in which Buyer has a direct or indirect ownership interest if such assignment becomes effective upon the closing of the transaction contemplated hereby, although such assignment shall not relieve Buyer of his obligations hereunder.

17.5    <u>Notices</u>. Except as otherwise expressly provided herein, all notices required or permitted to be given pursuant to the terms hereof (collectively, "<u>Notices</u>") shall be in writing and shall be delivered by hand delivery, professional courier service which provides written evidence of delivery, or sent by reputable overnight carrier (such as Federal Express), as follows:

| | |
|---|---|
| To Seller: | Malibu Associates, LLC<br>2400 Wyandotte Street, Suite B-102<br>Mountain View, CA 94043<br>Attention:  Thomas C. Hix |
| With a copy to: | Levine Neale Bender Yoo & Brill<br>10250 Constellation Boulevard, Suite 1700<br>Los Angeles, CA 90067<br>Attention: David Neale and Lindsey Stein |
| To Buyer: | Brixton Capital AC, LLC<br>4435 Eastgate Mall, Suite 310<br>San Diego, CA  92121<br>Attention:  Travis King and Bob Emri |
| With a copy to: | Teel & Roeper, LLP<br>11455 El Camino Real, Suite 300<br>San Diego, CA  92130<br>Attention:  Dean E. Roeper, Esq.<br>and Shannon L. Haines, Esq. |

The foregoing addresses may be changed by written notice to the other party as provided herein.  Any Notice will be deemed given on the date physically delivered to the indicated addressee, the date of receipted delivery, the date of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no Notice was given or if delivered via electronic mail, then on the date sent provided that another method of approved delivery is concurrently used.  In any event, the party delivering Notice shall use commercially reasonable efforts to provide a courtesy copy of each such Notice to the receiving

26

party via electronic mail (provided that such electronic mail notice shall not constitute a formal notice under the terms of this Paragraph 17.5).

17.6    Escrow Cancellation Costs.  If the Closing fails to occur due to Seller's default, Seller shall pay all Escrow cancellation charges.  If the Closing fails to occur due to Buyer's default, or if Buyer terminates this Agreement prior to the expiration of the Inspection Period, Buyer shall pay all Escrow Cancellation Charges.  If the Closing fails to occur for any reason other than the foregoing, Buyer and Seller shall each pay one-half (1/2) of any Escrow Cancellation Charges.  "Escrow Cancellation Charges" means all fees, charges and expenses incurred by Escrow Agent, including, without limitation, all expenses incurred in connection with issuance of the title commitment and other title matters, that are charged to Buyer or Seller.

17.7    Exhibits.  Exhibits A through E inclusive, are attached hereto and incorporated herein by this reference.

17.8    Authority.  Each person executing this Agreement on behalf of a party to this Agreement hereby represents and warrants that he or she has authority to execute this Agreement on behalf of such party.

17.9    Headings.  Headings at the beginning of any paragraph or section of this Agreement are solely for the convenience of the Parties and are not a part of this Agreement or to be used in the interpretation hereof.

17.10    Survival.  The representations, warranties and covenants of the Parties hereto shall survive Close of Escrow, or the termination of this Agreement in the event that Close of Escrow shall not occur.  The liability of Seller hereunder shall extend to the Buyer of the Purchased Assets from Seller hereunder and to any subsequent Buyer or transferee of the Purchased Assets.

17.11    Time of the Essence.  Time is of the essence of this Agreement and of each provision hereof.  The time in which any act required or permitted by this Agreement is to be performed shall be determined by excluding the day upon which the event occurs from whence the time commences.  If the last day upon which performance would otherwise be required or permitted is not a Business Day, then the time for performance shall be extended to the next Business Day.

17.12    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  A party may deliver executed signature pages to this Agreement by electronic (portable data format) transmission to the other party, which electronic copies shall be deemed to be an original executed signature page binding on the party that so delivered the executed signature pages by electronic copy.

**[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date.

BUYER:

**BRIXTON CAPITAL AC, LLC,**
a Delaware limited liability company

By: _____

Name: TRAVIS KING

Title: CEO

Dated: 8/20/15

SELLER:

**MALIBU ASSOCIATES, LLC,**
a California limited liability company

By:   The Thomas C. Hix Company No. 3, Inc.,
       a California corporation,
       a Managing Member


       By: _____
             Thomas C. Hix,
             President


By:   MPK Development, LLC,
       a California limited liability company,
       a Managing Member


       By: _____
             Mark D. Kvamme,
             Managing Member

Dated:      August ____, 2015

28

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date.

**BUYER:**

**BRIXTON CAPITAL AC, LLC,**
a Delaware limited liability company

By: _____

Name: _____

Title: _____

Dated: _____

**SELLER:**

**MALIBU ASSOCIATES, LLC,**
a California limited liability company

By:   The Thomas C. Hix Company No. 3, Inc.,
      a California corporation,
      a Managing Member

      By: _____
           Thomas C. Hix,
           President

By:   MPK Development, LLC,
      a California limited liability company,
      a Managing Member

      By: _____
           Mark D. Kvamme,
           Managing Member

Dated:      August _____, 2015

28

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the Effective Date.

**BUYER:**

**BRIXTON CAPITAL AC, LLC,**
a Delaware limited liability company

By: _____
Name: _____
Title: _____
Dated: _____

**SELLER:**

**MALIBU ASSOCIATES, LLC,**
a California limited liability company

By:  The Thomas C. Hix Company No. 3, Inc.,
     a California corporation,
     a Managing Member

    By: _____
       Thomas C. Hix,
       President

By:  MPK Development, LLC,
     a California limited liability company,
     a Managing Member

    By: _____
       Mark D. Kvamme,
       Managing Member

Dated:      August _21_, 2015

28

# EXHIBIT A

## LEGAL DESCRIPTION OF THE REAL PROPERTY

All that certain real property situated in the County of Los Angeles, State of California, described as follows:

PARCEL 1: (APN: 2058-015-003)

THAT PORTION OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHERLY AND EASTERLY OF THE CENTER LINE OF DECKER ROAD, AS DESCRIBED IN THE DEED RECORDED IN BOOK 2544 PAGE 277, OFFICIAL RECORDS OF SAID LOS ANGELES COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT WHICH IS THE MOST SOUTHEASTERLY CORNER OF THE LANDS CONVEYED TO MABLE STRASZACKER, A MARRIED WOMAN, TO RALPH M. SWITZKY, A SINGLE MAN, BY DEED RECORDED IN BOOK 15134 PAGE 285, OFFICIAL RECORDS OF LOS ANGELES COUNTY; THENCE EASTERLY ALONG THE SOUTHERLY LINE OF THE NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, 200 FEET TO A POINT; THENCE NORTHERLY ALONG A LINE PARALLEL TO THE EASTERLY LINE OF SAID NORTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, S.B.B.& M., TO A POINT IN THE CENTER LINE OF DECKER ROAD, (AS DESCRIBED IN THE DEED RECORDED IN BOOK 2544 PAGE 277, OFFICIAL RECORDS OF LOS ANGELES COUNTY); THENCE WESTERLY ALONG THE CENTER LINE OF DECKER ROAD TO THE MOST NORTHEASTERLY CORNER OF SAID LANDS DESCRIBED IN SAID DEED RECORDED IN BOOK 15134 PAGE 285 OF SAID OFFICIAL RECORDS; THENCE SOUTHERLY ALONG THE EASTERLY LINE OF THE PROPERTIES CONVEYED BY SAID DEED, RECORDED IN BOOK 15134 PAGE 285, OFFICIAL RECORDS OF LOS ANGELES COUNTY, TO THE POINT OF BEGINNING.

PARCEL 2: (APN: 2058-015-044)

THAT PORTION OF THE SOUTHWEST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHERLY AND EASTERLY OF THE CENTER LINE OF DECKER COUNTY ROAD, AS DESCRIBED IN DEED RECORDED IN BOOK 2544 PAGE 277, OFFICIAL RECORDS OF SAID COUNTY.

EXCEPT THEREFROM A PORTION SECTION 3, TOWNSHIP 1 SOUTH RANGE 19 WEST IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, COMMENCING AT THE SOUTH ONE QUARTER (1/4) SECTION CORNER OF SAID SECTION 3, THENCE ALONG THE SOUTH LINE OF SAID SECTION 3, SOUTH 89° 25' 34" EAST 207.80 FEET

1

TO A POINT HEREINAFTER REFERRED TO AS POINT A; THENCE NORTH 27° 39' 39" EAST 302.67 FEET, MORE OR LESS, TO THE NORTH RIGHT OF WAY LINE OF MULHOLLAND HIGHWAY, 100.00 FEET WIDE, AS SHOWN ON COUNTY SURVEYORS MAP CS 8824 SHEET 9, AND THE POINT OF BEGINNING; THENCE,

1. NORTH 27° 39' 39" EAST 93.01 FEET, MORE OR LESS, TO A POINT THAT BEARS NORTH 27° 39' 39" EAST 395.68 FEET FROM BEFORE MENTIONED POINT A; THENCE

2. NORTH 22° 28' 25" WEST 187.64 FEET; THENCE,

3. NORTH 87° 48' 05" WEST 135.60 FEET MORE OR LESS TO THE EASTERLY RIGHT OF WAY LINE OF WESTLAKE BOULEVARD, FORMERLY DECKER ROAD, 40.00 FEET WIDE A SHOWN ON COUNTY SURVEYORS MAP CS 8093; THENCE, ALONG SAID RIGHT OF WAY THE FOLLOWING THREE COURSES,

4. SOUTH 01° 53' 38" WEST 111.14 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE TO THE WEST, HAVING A RADIUS OF 220.00 FEET; THENCE SOUTHERLY AND SOUTHWESTERLY ALONG SAID CURVE

5. 123.94 FEET THROUGH A CENTRAL ANGLE OF 32° 16' 40"; THENCE

6. SOUTH 34° 10' 18" WEST 2.05 FEET, MORE OR LESS, TO SAID NORTH RIGHT OF WAY MULHOLLAND HIGHWAY, BEING A POINT OF CUSP ON A CURVE CONCAVE SOUTH HAVING A RADIUS OF 350.00 FEET, A RADIAL LINE BEARS NORTH 8° 36' 53" WEST, THENCE, EASTERLY AND SOUTHEASTERLY ALONG SAID NORTH RIGHT OF WAY

7. 212.43 FEET THROUGH A CENTRAL ANGLE OF 34° 46' 28" TO THE POINT OF BEGINNING.

PARCEL 3: (PORTION OF APN: 2058-015-037)

THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THE EASTERLY 998.71 FEET (MEASURED ALONG THE SOUTHERLY LINE) OF SAID LAND.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING NORTHERLY OF THE SOUTHERLY LINE OF THE 100 FOOT STRIP OF LAND, DESCRIBED IN DEED TO THE COUNTY OF LOS ANGELES, (FOR PUBLIC ROAD AND HIGHWAY PURPOSES), RECORDED IN BOOK 11862 PAGE 146, OFFICIAL RECORDS.

PARCEL 4: (PORTION OF APN: 2058-015-037)

THE WESTERLY 333.15 FEET OF THE EASTERLY 998.71 FEET (MEASURED ALONG

2

THE SOUTHERLY LINE) OF THE SOUTHEAST QUARTER OF THE SOUTHEAST
QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO
MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA,
ACCORDING TO THE OFFICIAL PLAT THEREOF LYING SOUTHERLY OF A STRIP OF
LAND 100.00 FEET WIDE, THE CENTER LINE OF WHICH IS DESCRIBED AS
FOLLOWS:

BEGINNING AT THE WESTERLY TERMINUS OF THAT CERTAIN COURSE HAVING A
BEARING AND LENGTH OF NORTH 84° 27' 05" EAST 561.42 FEET IN THE CENTER
LINE OF MULHOLLAND HIGHWAY, AS DESCRIBED IN DEED RECORDED IN BOOK
10710 PAGE 291, OFFICIAL RECORDS, OF THE COUNTY OF LOS ANGELES, THENCE
SOUTH 84° 27' 05" WEST 244.12 FEET TO THE BEGINNING OF A CURVE CONCAVE
TO THE NORTH, AND HAVING A RADIUS OF 2000 FEET; THENCE WESTERLY
ALONG SAID CURVE, 642.52 FEET; THENCE NORTH 77° 08' 30" WEST 185.62 FEET TO
THE BEGINNING OF A CURVE CONCAVE TO THE SOUTH AND HAVING A RADIUS
OF 900 FEET; THENCE WESTERLY ALONG SAID LAST MENTIONED CURVE, 921.53
FEET; THENCE SOUTH 44° 11' 30" WEST 101.76 FEET.

ALL CURVES ARE TANGENT TO THE STRAIGHT LINES WHICH THEY JOIN, TO BE
KNOWN AS MULHOLLAND HIGHWAY, REFERENCE IS MADE TO COUNTY
SURVEYOR'S MAP NO. 8824, ON FILE IN THE OFFICE OF THE SURVEYOR OF THE
COUNTY OF LOS ANGELES.

PARCEL 5: (PORTION OF APN: 2058-015-037)

THE EASTERLY 332.64 FEET (MEASURED ALONG THE SOUTHERLY LINE) OF THE
SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 1
SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF,
LYING SOUTHERLY OF A STRIP OF LAND 100.00 FEET WIDE, THE CENTER LINE OF
WHICH IS DESCRIBED AS FOLLOWS:

BEGINNING AT THE WESTERLY TERMINUS OF THAT CERTAIN COURSE HAVING A
BEARING AND LENGTH OF NORTH 84° 27' 05" EAST 561.42 FEET IN THE CENTER
LINE OF MULHOLLAND HIGHWAY, AS DESCRIBED IN DEED RECORDED IN BOOK
1071 PAGE 291, OFFICIAL RECORDS OF THE COUNTY OF LOS ANGELES; THENCE
SOUTH 84° 27' 05" WEST 244.12 FEET TO THE BEGINNING OF A CURVE CONCAVE
TO THE NORTH, AND HAVING A RADIUS OF 2000 FEET;

THENCE WESTERLY ALONG SAID CURVE, 642.52 FEET; THENCE NORTH 77° 08' 30"
WEST 185.62 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE SOUTH AND
HAVING A RADIUS OF 900 FEET; THENCE WESTERLY ALONG SAID LAST
MENTIONED CURVE, 921.53 FEET; THENCE SOUTH 44° 11' 30" WEST 101.76 FEET.

ALL CURVES ARE TANGENT TO THE STRAIGHT LINES WHICH THEY JOIN TO BE
KNOWN AS MULHOLLAND HIGHWAY.  REFERENCE IS MADE TO COUNTY
SURVEYOR'S MAP NO. 8824, ON FILE IN THE OFFICE OF THE SURVEYOR OF THE

COUNTY OF LOS ANGELES.

PARCEL 6: (PORTION OF APN: 2058-015-037)

THAT PORTION OF THE WESTERLY 332.92 FEET OF THE EASTERLY 665.56 FEET (MEASURED ALONG THE SOUTHERLY LINE) OF THE SOUTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHERLY OF THE SOUTHERLY LINE OF MULHOLLAND HIGHWAY, 100.00 FEET WIDE, AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES, RECORDED OCTOBER 25, 1932 IN BOOK 11862 PAGE 146, OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 7: (APN: 2058-015-013)

THAT PORTION OF THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 3, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING SOUTHERLY AND EASTERLY OF THE CENTER LINE OF DECKER COUNTY ROAD, AS DESCRIBED IN DEED RECORDED IN BOOK 2544 PAGE 277, OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 8A: (APN: 4471-001-028 AND 029)

THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THAT PORTION OF SAID LAND IN THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER DESCRIBED IN THE DEED TO BOYD A. DAVIS, RECORDED DECEMBER 29, 1961 IN BOOK D-1463 PAGE 954, OFFICIAL RECORDS, AS INSTRUMENT NO. 1741, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 8B: (APN: 4471-001-005)

THE NORTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO OFFICIAL PLAT THEREOF.

PARCEL 9: (APN: 4471-001-019)

THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN BASE AND MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING SOUTHERLY OF A STRAIGHT LINE EXTENDING NORTHWESTERLY FROM THE SOUTHEASTERLY CORNER OF THE SOUTH HALF OF SAID NORTHEAST QUARTER OF SAID SECTION 10, TO THE NORTHWESTERLY CORNER OF SAID SOUTH HALF OF THE NORTHEAST QUARTER OF SAID SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, S. B. B.& M, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA.

PARCEL 10A: (APN: 4471-001-0032)

THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING SOUTHERLY OF A STRAIGHT LINE EXTENDING NORTHWESTERLY FROM THE SOUTHEASTERLY CORNER OF THE SOUTH HALF OF SAID NORTHEAST QUARTER OF SAID SECTION 10, TO THE NORTHWESTERLY CORNER OF SAID SOUTH HALF OF THE NORTHEAST QUARTER OF SAID SECTION 10.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING EASTERLY OF A LINE THAT IS PARALLEL WITH THE EASTERLY LINE OF SAID SECTION, AND WHICH PASSES THROUGH A POINT IN THE NORTHERLY LINE OF SAID NORTHEAST QUARTER (DISTANT WESTERLY THEREON) 500.00 FEET FROM SAID EASTERLY LINE.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND, INCLUDED WITHIN THE FOLLOWING DESCRIBED LINES:

BEGINNING AT THE INTERSECTION OF THE WESTERLY LINE OF THE EASTERLY 500.00 FEET, MEASURED ALONG THE NORTHERLY LINE OF THE NORTHEAST QUARTER OF SECTION 10, WITH A STRAIGHT LINE EXTENDING NORTHWESTERLY FROM THE SOUTHEASTERLY CORNER OF THE NORTHEAST QUARTER OF SECTION 10, TO THE NORTHWESTERLY CORNER OF THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 10; THENCE NORTHWESTERLY ALONG SAID STRAIGHT LINE TO ITS INTERSECTION WITH THE WESTERLY LINE OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10; THENCE NORTHERLY ALONG SAID WESTERLY LINE TO A POINT DISTANT SOUTHERLY THEREON 50.00 FEET FROM THE NORTHWESTERLY CORNER OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER; THENCE SOUTHEASTERLY IN A DIRECT LINE TO A POINT IN SAID WESTERLY LINE OF THE EASTERLY 500.00 FEET OF SAID NORTHEAST QUARTER OF SECTION 10 DISTANT SOUTHERLY THEREON 300.00 FEET FROM ITS INTERSECTION WITH THE NORTHERLY LINE OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER; THENCE SOUTHERLY ALONG SAID WESTERLY LINE TO THE POINT OF BEGINNING.

PARCEL 10B: (APN 4471-001-033)

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF. EXCEPT THEREFROM THE EASTERLY 500.00 FEET, MEASURED ALONG THE NORTHERLY LINE OF SAID NORTHEAST QUARTER.

PARCEL 11A: (APN: 4471-001-036)

THE EASTERLY 500.00 FEET, MEASURED ALONG THE NORTHERLY LINE OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP I SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND INCLUDED WITHIN THE FOLLOWING DESCRIBED LINES:

BEGINNING AT A POINT IN THE EASTERLY LINE OF THE NORTHEAST ONE-QUARTER OF SAID SECTION 10, SAID POINT BEING SOUTH 01° 31' 53" WEST 314.12 FEET, MEASURED ALONG SAID EASTERLY LINE FROM A COUNTY SURVEYOR'S BRASS CAP MONUMENT SET AT THE NORTHEAST CORNER OF SAID SECTION 10; THENCE SOUTH 01° 31' 53" WEST 2300.71 FEET, MORE OR LESS, MEASURED ALONG SAID EASTERLY LINE TO THE EAST ONE-QUARTER CORNER OF SAID SECTION 10, SAID EAST ONE-QUARTER CORNER BEING A COUNTY SURVEYOR'S BRASS CAP MONUMENT; THENCE NORTH 11° 00' 53" WEST 703.36 FEET, MORE LESS, TO A POINT, SAID LAST MENTIONED POINT BEARS SOUTH 88° 31' 03" WEST 153.00 FEET, FROM A POINT IN THE EASTERLY LINE OF THE NORTHEAST ONE-QUARTER OF SAID SECTION 10. SAID LAST MENTIONED POINT BEING NORTH 01° 31' 53" EAST 694.59 FEET, MEASURED ALONG SAID EASTERLY LINE, FROM A COUNTY SURVEYOR'S BRASS CAP MONUMENT SET AT THE EAST ONE-QUARTER CORNER OF SAID SECTION 10; THENCE NORTH 06° 56' 20" EAST 1621.36 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

PARCEL 11B: (APN: 4471-001-037)

THE EASTERLY 500.00 FEET, MEASURED ALONG THE NORTHERLY LINE OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING SOUTHERLY OF A STRAIGHT LINE EXTENDING NORTHWESTERLY FROM THE SOUTHEASTERLY CORNER OF THE SOUTH HALF OF SAID NORTHEAST QUARTER OF SECTION 10, TO THE NORTHWESTERLY CORNER OF SAID SOUTH HALF, OF THE NORTHEAST QUARTER OF SECTION 10.

ALSO EXCEPT THEREFROM THAT PORTION OF SAID LAND INCLUDED WITHIN THE FOLLOWING DESCRIBED LINES:

6

BEGINNING AT A POINT IN THE EASTERLY LINE OF THE NORTHEAST ONE-QUARTER OF SAID SECTION 10, SAID POINT BEING SOUTH 01° 31' 53" WEST 314.12 FEET, MEASURED ALONG SAID EASTERLY LINE FROM A COUNTY SURVEYOR'S BRASS CAP MONUMENT SET AT THE NORTHEAST CORNER OF SAID SECTION 10; THENCE SOUTH 01° 31' 53" WEST 2300.71 FEET, MORE OR LESS, MEASURED ALONG SAID EASTERLY LINE TO THE EAST ONE-QUARTER CORNER OF SAID SECTION 10, SAID EAST ONE-QUARTER CORNER BEING A COUNTY SURVEYOR'S BRASS CAP MONUMENT; THENCE NORTH 11° 00' 53" WEST 703.36 FEET, MORE LESS, TO A POINT, SAID LAST MENTIONED POINT BEARS SOUTH 88° 31' 03" WEST 153.00 FEET, FROM A POINT IN THE EASTERLY LINE OF THE NORTHEAST ONE-QUARTER OF SAID SECTION 10. SAID LAST MENTIONED POINT BEING NORTH 01° 31' 53" EAST 694.59 FEET, MEASURED ALONG SAID EASTERLY LINE, FROM A COUNTY SURVEYOR'S BRASS CAP MONUMENT SET AT THE EAST ONE-QUARTER CORNER OF SAID SECTION 10; THENCE NORTH 06° 56' 20" EAST 1621.36 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

PARCEL 12: (APN: 4471-001-038)

THAT PORTION OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WESTERLY LINE OF THE EASTERLY 500.00 FEET, MEASURED ALONG THE NORTHERLY LINE OF THE NORTHEAST QUARTER OF SECTION 10, WITH A STRAIGHT LINE EXTENDING NORTHWESTERLY FROM THE SOUTHEASTERLY CORNER OF THE NORTHEAST QUARTER OF SECTION 10, TO THE NORTHWESTERLY CORNER OF THE SOUTH HALF OF THE NORTHEAST QUARTER OF SECTION 10; THENCE NORTHWESTERLY ALONG SAID STRAIGHT LINE TO ITS INTERSECTION WITH THE WESTERLY LINE OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10; THENCE NORTHERLY ALONG SAID WESTERLY LINE TO A POINT DISTANT SOUTHERLY THEREON 50.00 FEET FROM THE NORTHWESTERLY CORNER OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER; THENCE SOUTHEASTERLY IN A DIRECT LINE TO A POINT IN SAID WESTERLY LINE OF THE EASTERLY 500.00 FEET OF SAID NORTHEAST QUARTER OF SECTION 10, DISTANT SOUTHERLY THEREON 300.00 FEET FROM ITS INTERSECTION WITH THE NORTHERLY LINE OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER; THENCE SOUTHERLY ALONG SAID WESTERLY LINE TO THE POINT OF BEGINNING.

PARCEL 13A: (APN: 4471-001-034)

THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10 TOWNSHIP 1 SOUTH, RANGE r9 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL MAP THEREOF.

7

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING NORTHERLY OF A STRAIGHT LINE EXTENDING NORTHWESTERLY FROM THE SOUTHEASTERLY CORNER OF THE SOUTH HALF OF SAID NORTHEAST QUARTER OF SAID SECTION 10, TO THE NORTHWESTERLY CORNER OF SAID COUNTY HALF OF THE NORTHEAST QUARTER OF SAID SECTION 10 TOWNSHIP 1 SOUTH, RANGE 19 WESTS. B. B. & M, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA.

PARCEL 13B: (APN# 4471-001-035)

THAT PORTION OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, COUNTY OF LOS ANGELES, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

THAT PORTION OF SAID LAND LYING SOUTHERLY OF A STRAIGHT LINE EXTENDING NORTHWESTERLY FROM THE SOUTHEASTERLY CORNER OF THE SOUTH HALF OF SAID NORTHEAST QUARTER OF SAID SECTION 10, TO THE NORTHWESTERLY CORNER OF SAID SOUTH HALF OF THE NORTHEAST QUARTER OF SAID SECTION 10.

PARCEL 13C: (APN # 4471-002-010)

THE WEST HALF OF THE SOUTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL 13D: (APN # 4471-002-011)

THE EAST HALF OF THE SOUTHEAST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL 14A: (APN: 4471-002-027)

THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING NORTHWESTERLY OF THE SOUTHEASTERLY LINE OF DECKER ROAD, AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES, RECORDED AS INSTRUMENT NO. 95 ON APRIL 29, 1918, IN BOOK 6682, PAGE 1 OF DEEDS.

PARCEL 14B: (APN: 4471-002-026)

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 10, AND THOSE PORTIONS OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER

AND THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SAID SECTION 10, ALL IN TOWNSHIP 1 SOUTH RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, LYING NORTHEASTERLY, EASTERLY AND SOUTHEASTERLY OF THE SOUTHEASTERLY LINE OF DECKER CANYON ROAD, AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES, RECORDED APRIL 29, 1918 IN BOOK 6682 PAGE 1 OF DEEDS, RECORDS OF SAID COUNTY.

EXCEPT THAT PORTION OF SAID LAND, IF ANY, AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES, RECORDED IN BOOK 1962 PAGE 258, OFFICIAL RECORDS OF SAID COUNTY.

ALSO EXCEPT THERFROM THAT POTION OF SAID LAND LYING WITHIN THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 10, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

ALSO EXCEPT THAT PORTION OF SAID LAND, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE CENTER LINE OF DECKER CANYON ROAD, AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES, RECORDED MARCH 22, 1923 IN BOOK 1962 PAGE 258, OFFICIAL RECORDS, WITH THE SOUTH LINE OF SECTION 9; THENCE ALONG SAID CENTER LINE AS FOLLOWS: NORTH 81° 58' 30" EAST 133.84 FEET; THENCE NORTH 59° 30' 30" EAST 73.97 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 100 FEET; THENCE NORTHEASTERLY 51.02 FEET ALONG THE ARC OF THE ABOVE MENTIONED CURVE; THENCE TANGENT TO SAID CURVE, NORTH 88° 44' 30" EAST 21.82 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY HAVING A RADIUS OF 40 FEET; THENCE NORTHEASTERLY 69.67 FEET ALONG THE ARC OF THE ABOVE MENTIONED CURVE; THENCE TANGENT TO SAID CURVE, NORTH 8° 54' 20" EAST 105.99 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY HAVING A RADIUS OF 100.00 FEET; THENCE NORTHERLY 76.26 FEET ALONG THE ARC OF THE ABOVE MENTIONED 100.00 FOOT RADIUS CURVE; THENCE TANGENT TO SAID CURVE, NORTH 34° 47' 20" WEST 4.44 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE NORTHEASTERLY HAVING A RADIUS OF 70 FEET; THENCE NORTHERLY 50.43 FEET ALONG THE ARC OF THE ABOVE MENTIONED 70 FOOT RADIUS CURVE; THENCE TANGENT TO SAID CURVE, NORTH 6° 29' 20" EAST 17.26 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE EASTERLY HAVING A RADIUS OF 100 FEET; THENCE NORTHEASTERLY 59.99 FEET ALONG THE ARC OF THE ABOVE MENTIONED 100 FOOT RADIUS CURVE; THENCE TANGENT TO SAID CURVE, NORTH 40° 51' 40" EAST 83.35 FEET; THENCE NORTH 48° 18' 00" EAST 185 FEET; THENCE NORTH 20° 59' 10" EAST 81.84 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY HAVING A RADIUS OF 10 FEET; THENCE NORTHEASTERLY 84.53 FEET ALONG THE ARC OF

THE ABOVE MENTIONED 100 FOOT RADIUS CURVE; THENCE TANGENT TO SAID
CURVE, NORTH 69° 25' 10" EAST 194.19 FEET; THENCE SOUTH 85° 43' 30" EAST
153.24 FEET; THENCE NORTH 78° 27' 20" EAST 211.90 FEET; THENCE NORTH 71° 43'
30" EAST 304.16 FEET; THENCE NORTH 87° 45' 30" EAST 432.70 FEET TO THE
BEGINNING OF A TANGENT CURVE CONCAVE NORTHWESTERLY HAVING A
RADIUS OF 100 FEET; THENCE NORTHEASTERLY 107.03 FEET ALONG THE ARC OF
THE ABOVE MENTIONED 100 FOOT RADIUS CURVE; THENCE TANGENT TO SAID
CURVE, NORTH 26° 26' EAST 64.69 FEET; THENCE LEAVING SAID ROAD, SOUTH 8°
54' EAST 95.5 FEET; THENCE SOUTH 18° 44' EAST 57.5 FEET; THENCE SOUTH 46° 04'
EAST 69.3 FEET; THENCE SOUTH 12° 56' EAST 99.6 FEET; THENCE SOUTH 77" 10'
EAST 170.8 FEET; THENCE SOUTH 38° 34' EAST 66.00 FEET; THENCE NORTH 78° 32'
EAST 45.6 FEET; THENCE SOUTH 54° 26' EAST 96.3 FEET; THENCE SOUTH 39° 11' 10"
EAST 262.37 FEET; THENCE SOUTH 62° 20' EAST 173.7 FEET; THENCE SOUTH 5° 28'
EAST 86.8 FEET; THENCE SOUTH 35° 06' EAST 50.4 FEET; THENCE SOUTH 5° 00'
EAST 54.3 FEET; THENCE SOUTH 47° 00' EAST 221.2 FEET; THENCE SOUTH 54° 34'
WEST 20.2 FEET TO THE INTERSECTION OF THE SOUTH LINE OF SAID SECTION 10;
THENCE NORTH 89° 51' WEST 1620.82 FEET TO THE COMMON CORNER OF SECTION
9, 10, 15 AND 16, SAID TOWNSHIP AND RANGE; THENCE SOUTH 89° 51' 50" WEST
1305.95 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

PARCEL 15: (APN: 4471-021-034)

THE EASTERLY 300.00 FEET OF THE WEST HALF OF THE NORTHEAST QUARTER OF
SECTION 15, TOWNSHIP 1 SOUTH, RANGE 19 WEST, IN THE COUNTY OF LOS
ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF,
LYING NORTHERLY OF A STRIP OF LAND 60.00 FEET WIDE, KNOWN AS ENCINAL
CANYON ROAD, AS DESCRIBED IN DEED GRANTED TO SAID COUNTY, RECORDED
MARCH 29, 1955 IN BOOK 47324 PAGE 226, OFFICIAL RECORDS OF SAID COUNTY.

PARCEL 16: (APN # 4471-021-033)

THAT PORTION OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF
SECTION·15, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO BASE AND
MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA,
ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID QUARTER; THENCE ALONG
THE NORTHERLY LINE OF SAID QUARTER, NORTH 89° 49' 35" EAST 225 FEET;
THENCE SOUTH 0° 18' 53" WEST ALONG A LINE PARALLEL WITH THE WESTERLY
LINE OF SAID QUARTER TO THE NORTHERLY LINE OF ENCINAL CANYON ROAD,
(60 FEET WIDE), DESCRIBED AS PARCEL "A" IN DEED RECORDED APRIL 27, 1955 IN
BOOK 47605 PAGE 380, OFFICIAL RECORDS, AS INSTRUMENT NO. 2850 OF SAID
COUNTY; THENCE ALONG SAID ENCINAL CANYON ROAD, SOUTH 89° 36' WEST
224.99 FEET TO SAID WESTERLY LINE; THENCE NORTH 0° 18' 53" EAST ALONG
SAID WESTERLY LINE TO THE POINT OF BEGINNING.

EXCEPT THEREFROM ALL OIL, GAS AND MINERALS IN, ON OR UNDER SAID LAND,

G:\NEWDOCS\B028\028\PSA\00180512.DOCX

BUT WITHOUT ANY RIGHT OF SURF ACE ENTRY TO A DEPTH OF 500 FEET BELOW
THE SURF ACE OF SAID LAND, AS RESERVED BY FRANK BIASTRE AND CLAUDINE
BIASTRE, HIS WIFE, IN DEED RECORDED SEPTEMBER 18, 1972 AS INSTRUMENT
NO. 488.

PARCEL 17A: (APN # 4471-003-011)

THE NORTH HALF OF THE NORTHWEST QUARTER OF SECTION 11, TOWNSHIP 1
SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, COUNTY OF LOS
ANGELES, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THEREFROM THAT PORTION OF SAID LAND, LYING EASTERLY AND
NORTHEASTERLY OF A LINE, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHERLY LINE OF SAID SECTION
11, WITH THE CENTERLINE OF MULHOLLAND HIGHWAY, (100 FEET WIDE), AS
DESCRIBED IN RESOLUTION APPROVED ON APRIL 2, 1934 BY THE BOARD OF
SUPERVISORS OF LOS ANGELES COUNTY, RECORDED APRIL 10, 1934 IN BOOK
12707 PAGE 152, OFFICIAL RECORDS, AS INSTRUMENT NO. 943 OF SAID COUNTY;
THENCE SOUTHERLY AND SOUTHEASTERLY, ALONG SAID CENTER LINE TO ITS
FIRST INTERSECTION THEREOF WITH THE SOUTHERLY LINE OF THE NORTH HALF
OF THE NORTHWEST QUARTER OF SAID SECTION 11.

PARCEL 17B: (APN#4471-003-010)

THE NORTHEASTERLY QUARTER OF THE NORTHWEST QUARTER OF SECTION 11
TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE
OFFICIAL PLAT THEREOF.

EXCEPT THEREFROM THAT PORTION OF SAID LAND LYING EASTERLY AND
NORTHEASTERLY OF A LINE, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHERLY LINE OF SAID SECTION
11, WITH THE CENTERLINE OF MULHOLLAND HIGHWAY, (100 FEET WIDE), AS
DESCRIBED IN RESOLUTION APPROVED ON APRIL 2, 1934 BY THE BOARD OF
SUPERVISORS OF LOS ANGELES COUNTY, RECODED APRIL 10, 1934 IN BOOK
12707, PAGE 152 OFFICIAL RECORDS, AS INSTRUMENT NO. 943 OF SAID COUNTY;
THENCE SOUTHERLY AND SOUTHEASTERLY, ALONG SAID CENTER LINE TO ITS
FIRST INTERSECTION THEREOF WITH THE SOUTHERLY LINE OF THE NORTH HALF
OF THE NORTHWEST QUARTER OF SAID SECTION 11.

PARCEL 18A: (APN # 4471-003-032)

THAT PORTION OF THE NORTH HALF OF THE SOUTHWEST QUARTER OF SECTION
11, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN IN THE
COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE
OFFICIAL PLAT THEREOF, LYING SOUTHWESTERLY OF THE FOLLOWING

11

DESCRIBED LINE:

BEGINNING AT THE NORTHWESTERLY CORNER OF SAID SOUTHWEST QUARTER; THENCE SOUTH 71° 57' 58" EAST 2825.01 FEET TO A POINT IN THE EASTERLY LINE OF SAID SOUTHWEST QUARTER, DISTANT THEREON NORTH 0° 47' 04" EAST 1766.75 FEET FROM THE SOUTHEAST CORNER OF SAID SOUTHWEST QUARTER.

PARCEL 18B: (APN # 4471-003-030)

THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 11, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL 18C: (APN # 4471-003-031)

THE SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 11, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF LOS ANGELES STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL 19: (APN # 4471-021-028)

THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 15, TOWNSHIP 1 SOUTH, RANGE 19 WEST, SAN BERNARDINO BASE AND MERIDIAN, IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPT THAT PORTION AS FOLLOWS:

BEGINNING AT THE NORTHWEST CORNER OF SAID NORTHEAST QUARTER OF THE NORTHEAST QUARTER; THENCE EASTERLY ALONG THE NORTH LINE OF SAID NORTHEAST QUARTER A DISTANCE OF 225 FEET; THENCE SOUTHERLY PARALLEL WITH THE WEST LINE OF SAID QUARTER SECTION, A DISTANCE OF 950 FEET; THENCE SOUTHWESTERLY IN A DIRECT LINE TO A POINT IN SAID WEST LINE DISTANT SOUTHERLY 1000 FEET TO THE POINT OF BEGINNING.

ALSO EXCEPT THAT PORTION LYING SOUTHERLY AND SOUTHWESTERLY OF THE CENTERLINE OF THAT CERTAIN 60 FEET EASEMENT FOR PUBLIC ROAD AND HIGHWAY PURPOSES AS DESCRIBED IN THE DEED TO THE COUNTY OF LOS ANGELES RECORDED JUNE 6, 1955 AS INSTRUMENT NO. 3763, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THE SOUTH HALF OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF THE NORTHEAST QUARTER OF SAID SECTION.

**EXHIBIT B**

**GENERAL FORM OF SALE ORDER**



# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SANTA BARBARA DIVISION

| | |
|---|---|
| In re<br><br>MALIBU ASSOCIATES, LLC,<br><br>          Debtor. | Case No. 9:15-bk-10477-DS<br><br>Chapter 11<br><br>**ORDER PURSUANT TO 11 U.S.C. §§ 105(a) 363 AND 365, AND FED. R. BANKR. P. 2002, 6004 AND 6006: (I) APPROVING SALE OF CERTAIN ASSETS OF THE DEBTOR TO BUYER AND (III) GRANTING RELATED RELIEF** |

**Hearing:**
Date:      September \_\_\_, 2015
Time:      \_\_:00 \_\_.m.
Place:     United States Bankruptcy Court
           Courtroom 202
           1415 State Street
           Santa Barbara, CA 93101
Judge:    Hon. Deborah J. Saltzman

BN 18891974V1

1

2    Upon consideration of the motion dated _____, 2015 (the "Sale Motion") of

3    Malibu Associates, LLC (the "Seller" or "Debtor"), as debtor and debtor in possession pursuant

4    to sections 105(a), 363, and 365 of Title 11 of the United States Code (the "Bankruptcy Code"),

5    and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the

6    "Bankruptcy Rules"): (A) approving the terms and conditions of, and authorizing the Seller to

7    consummate the transactions contemplated by, the Purchase and Sale Agreement between Seller,

8    on the one hand, and _____ (the "Buyer"), substantially in the form attached

9    hereto as Exhibit A (the "Purchase Agreement" and together with other documents to be executed

10   in connection therewith, the "Transaction Documents") ; (B) authorizing (i) the sale or transfer

11   (the "Sale") of the assets of the Seller as more particularly described in the Purchase Agreement

12   (collectively, the "Purchased Assets"), free and clear of all liens, claims, encumbrances, defenses,

13   interests, debts, mortgages, security interests, pledges, charges, demands, options, rights

14   (including rights of first refusal, rights of offset, rights of recoupment and rights of recovery)

15   restrictions, or adverse claims of any kind or nature whatsoever and liabilities of any Person

16   (collectively, "Liens"); and (C) granting certain related relief; and the Court having heard

17   statements of counsel and the evidence presented in support of the relief requested in the Sale

18   Motion at a hearing on the Sale Motion held before the Court on _____, 2015 (the "Sale

19   Hearing"); and it appearing that the Court has jurisdiction over this matter; and it further

20   appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing

21   establish just cause for the relief granted herein; and after due deliberation thereon,

22       IT IS HEREBY FOUND AND DETERMINED THAT:

23            **Jurisdiction, Final Order and Statutory Predicates**

24       A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to

25   28 U.S.C. §§ 157(b)(1) and 1334(a).    This is a core proceeding pursuant to 28 U.S.C.

26   § 157(b)(2)(A), (N) and (O).    Venue is proper in this District and in this Court pursuant to

27   28 U.S.C. §§ 1408 and 1409.

28

B.      This Order constitutes an appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds there is no just reason for delay in the implementation of this Order, and expressly directs that this Order shall be immediately effective.

C.      The statutory predicates for the relief requested in the Sale Motion are sections 105, 363(b), (f), and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002(a)(2), 6004, 6006, 9006(c), 9007 and 9014.

**Notice of Sale**

D.      Actual written notice of the Sale Hearing and the Sale Motion, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities, including, but not limited to: (i) the United States Trustee for the Central District of California; (ii) the twenty largest unsecured creditors; (iii) counsel to the agent for the Seller's prepetition secured lenders; (iv) all taxing authorities having jurisdiction over any of the Purchased Assets, including, without limitation, the Internal Revenue Service; (v) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (vi) the Buyer and its respective counsel; and (vii) all persons or entities known or reasonably believed by the Seller to have asserted a Lien in any of the Purchased Assets.

E.      The Seller published notice of the Sale Motion and the time and place of the Sale Hearing in _____ on _____, 2015.

F.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.  The Debtor also has complied with all obligations to provide notice of the Sale Motion and the Sale Hearing as required by the Bankruptcy Code or by an order of the Court.   The foregoing described notice was good, sufficient and appropriate under the

1    circumstances, and no other or further notice of the Sale Motion, the Sale Hearing or the Sale is

2    required.

3         G.    The disclosures made by the Seller concerning the Transaction Documents, the

4    Sale, and the Sale Hearing were good, complete and adequate.

5                                 **Good Faith Buyer**

6         H.    The Buyer is not an "insider" of the Debtor, as that term is defined in section

7    101(31) of the Bankruptcy Code.

8         I.    Pursuant to Bankruptcy Code section 363(m), the Transaction Documents were

9    negotiated at arm's-length and entered into in good faith by the respective parties thereto and their

10   agents and representatives, and Buyer is entitled to all of the benefits and protections of section

11   363(m) of the Bankruptcy Code, in that: (i) Buyer has not violated section 363(n) of the

12   Bankruptcy Code by any action or inaction; (ii) no common identity of directors or controlling

13   stockholders exists between the Buyer and the Debtor; and (iii) the negotiation and execution of

14   the Transaction Documents and any other agreements or instruments related thereto was without

15   collusion, at arm's-length and in good faith.

16        J.    It is not a principal purpose of any Person entering into the Transaction Documents

17   or any transactions contemplated thereunder to evade liability to which such Person would be

18   subject under Subtitle D of Title IV of ERISA.

19                              **Highest and Best Offer**

20        K.    The Seller and its advisors diligently and in good faith analyzed all available

21   options in connection with the disposition of the Purchased Assets.

22        L.    The Seller and its advisor determined that the terms and conditions set forth in the

23   Transaction Documents, and the transfer to Buyer of the Purchased Assets and the rights granted

24   thereunder, represent a fair and reasonable purchase price and constitute the highest or otherwise

25   best value obtainable for the Purchased Assets as determined following an auction for the

26   Debtor's assets, including the Purchased Assets, held on _____, 2015. A reasonable

27   opportunity has been given to any interested party to make a higher and better offer for the

28   Purchased Assets. At the conclusion of the auction and the marketing of the Purchased Assets,

BN 18891974V1                                                 4

the Seller selected Buyer as the party having made the highest and best offer for the Purchased Assets pursuant to the terms of the Transaction Documents. All payments to be made by the Buyer and any agreements or arrangements entered into by the Buyer and the Seller in connection with the Sale have been disclosed.

M.    The Purchased Assets have been the subject of a full and robust marketing and sale process conducted prior to the date hereof, and the Debtor's determination that the Transaction Documents constitutes the highest and best offer for the Purchased Assets is a valid and sound exercise of the Debtor's business judgment. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater economic value to the Debtor's estate than the Buyer, and the terms set forth in the Transaction Documents are fair and reasonable and constitute the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtor's estate in respect of the Purchased Assets than would be provided by any other available alternative.

N.    Approval of the Sale Motion and the Transaction Documents and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate and other parties in interest.

O.    The Debtor has demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

**Validity of Transfer**

P.    The Seller has full corporate power and authority to execute and deliver the Transaction Documents and all other documents contemplated thereby, and no further consents or approvals are required for the Seller to consummate the transactions contemplated by the Transaction Documents, except as otherwise set forth in the Transaction Documents.

Q.    The transfer of each of the Purchased Assets to the Buyer will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest the Buyer with all right, title and interest of the Seller to the Purchased Assets free and clear of all Liens accruing, arising or relating to any time prior to the Closing Date.

BN 18891974V1

5

### Section 363(f) Is Satisfied

R.    The Seller may sell the Purchased Assets free and clear of all Liens because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has or have been satisfied.  Those holders of Liens against the Debtor, its estate or any of the Purchased Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of such Liens who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Liens, if any, in each instance against the Debtor, its estate, or any of the Purchased Assets, attach to the portion of the Purchase Price paid under the Purchase Agreement ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Closing Date, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

### No Successor

S.    Neither the Buyer nor any of its respective affiliates, successors or assigns, shall, as a result of any action taken in connection with the purchase of the Purchased Assets: (a) be considered a successor to any of the Debtor for any purpose, including but not limited to successor employer; (b) have, de facto or otherwise, merged with or into any of the Debtor; or (c) are a continuation or substantial continuation of any of the Debtor or any enterprise of the Debtor.

### Compelling Circumstances for an Immediate Sale

T.    To maximize the value of the Purchased Assets and preserve the viability of the business to which the Purchased Assets relate, it is essential that the Sale of the Purchased Assets occur within the time constraints set forth in the Transaction Documents.

### Other Provisions

U.    In connection with the sales of their products and services, the Debtor did not have a policy prohibiting the transfer of personally identifiable information about individuals that are not affiliated with the Debtor.

BN 18891974V1

6

1    NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED

2    THAT:

3    1.    The relief requested in the Sale Motion is GRANTED and APPROVED, and the

4    Sale contemplated thereby is approved as set forth in this Order.

5    2.    All objections to the Sale Motion or the relief requested therein that have not been

6    withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed

7    with the Court, and all reservations of rights included therein, are, except as provided in other

8    orders of the Court, hereby overruled on the merits or the interests of such objections have been

9    otherwise satisfied or adequately provided for.

10    **Approval of the Transaction Documents**

11    3.    The Transaction Documents and all other ancillary documents, and all of the terms

12    and conditions thereof, are hereby authorized and approved.

13    4.    Pursuant to section 363(b) of the Bankruptcy Code, the Seller is authorized and

14    empowered to take any and all actions necessary or appropriate to: (i) consummate the Sale of

15    each of the Purchased Assets to the Buyer pursuant to and in accordance with the terms and

16    conditions of the Transaction Documents; (ii) close the Sale as contemplated in the Transaction

17    Documents and this Order; and (iii) execute and deliver, perform under, consummate, implement

18    and close fully the Transaction Documents, together with all additional instruments and

19    documents that may be reasonably necessary or desirable to implement the Transaction

20    Documents and the Sale, including any other ancillary documents, or as may be reasonably

21    necessary or appropriate to the performance of the obligations as contemplated by the Transaction

22    Documents and such other ancillary documents.

23    5.    The terms and provisions of this Order shall be binding in all respects upon the

24    Buyer and the Debtor, any trustees appointed pursuant to chapter 11 or chapter 7 of the

25    Bankruptcy Code, the Debtor's estate, all creditors and shareholders of the Debtor, all interested

26    parties and their respective successors and assigns, including, but not limited to, any creditor

27    asserting a Lien in the Purchased Assets.

28    **Sale and Transfer of Purchased Assets**

6.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, the Seller is authorized to transfer the Purchased Assets on the Closing Date.  The Purchased Assets shall be transferred to the Buyer upon and as of the Closing Date, or at such other time as specified pursuant to the terms of the Purchase Agreement, and such transfer shall constitute a legal, valid, binding and effective transfer of such Purchased Assets, and, upon the Seller's receipt of the Purchase Price, shall be free and clear of all Liens, with all such Liens attaching to the Purchase Price with the same validity, priority, force and effect that they now have as against such Purchased Assets, subject to any claims and defenses the Seller and its estate may possess with respect thereto.

7.    Except as expressly permitted or otherwise specifically provided by the Transaction Documents or this Order, all persons and entities holding Liens or interests in the Purchased Assets arising under or out of, in connection with, or in any way relating to the Seller, the Purchased Assets, the operation of the Seller's business prior to the Closing Date or the transfer of the Purchased Assets to the Buyer hereby are forever barred, estopped and permanently enjoined from asserting against the Buyer or its successors or assigns, its property or the Purchased Assets, such persons' or entities' interests in and to the Purchased Assets.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens on the Purchased Assets, if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

8.    Buyer is not acquiring or assuming any of Seller's or any other Person's liabilities.

9.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would interfere with the ability of the Seller to sell and transfer the Purchased Assets to the Buyer in accordance with the terms of the Transaction Documents and this Order.

10.    All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to the Buyer at the Closing.

11.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to evidence conclusively the release or cancellation of the Liens and other encumbrances of record with respect to the Purchased Assets.

12.     If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, the Purchased Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to the Purchased Assets, the Debtor is hereby authorized and directed, and the Buyer is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.

13.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Documents.

**Other Provisions**

14.     Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, or the Purchased Assets, with respect to any (a) Lien arising under, out of, in connection with or in any way relating to the Debtor, the Buyer, the Purchased Assets, or the

BN 18891974V1

9

1   operation of the Purchased Assets prior to the Closing of the Sale, or (b) successor liability,

2   including, without limitation, the following actions: (i) commencing or continuing in any manner

3   any action or other proceeding against the Buyer, its successors, assets or properties; (ii)

4   enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order

5   against the Buyer, its successors, assets or properties; (iii) creating, perfecting or enforcing any

6   Lien or other encumbrance against the Buyer, its successors, assets or properties; (iv) asserting

7   any defense, setoff, right of subrogation or recoupment of any kind against any obligation due the

8   Buyer or its successors, whether under the Purchased Assets or otherwise; (v) commencing or

9   continuing any action, in any manner or place, that does not comply or is inconsistent with the

10  provisions of this Order or other orders of the Court, or the agreements or actions contemplated or

11  taken in respect thereof; or (vi) revoking, terminating or failing or refusing to issue or renew any

12  license, permit or authorization to operate any of the Purchased Assets or conduct any of the

13  businesses operated with the Purchased Assets.

14      15.     Other than as provided in the Transaction Documents, the Buyer shall not have

15  any liability or other obligation of the Debtor arising under or related to the Purchased Assets.

16  Without limiting the generality of the foregoing, the Buyer shall not be liable for any claims

17  against the Seller or any of its predecessors or affiliates, and the Buyer shall have no successor or

18  vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust,

19  environmental, successor or transferee liability, labor law, de facto merger or substantial

20  continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising,

21  whether fixed or contingent, with respect to the Seller or any obligations of the Seller arising prior

22  to the Closing Date, including, but not limited to, liabilities on account of any taxes arising,

23  accruing or payable under, out of, in connection with, or in any way relating to the operation of

24  the Purchased Assets prior to the Closing.

25      16.     The transactions contemplated by the Transaction Documents are undertaken by

26  the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the

27  Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization

28  provided herein to consummate the Sale shall not affect the validity of the Sale. The Buyer is a

BN 18891974V1                         10

1    good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is

2    entitled to the full protections of section 363(m) of the Bankruptcy Code.

3        17.    The consideration provided by the Buyer for the Purchased Assets purchased by

4    the Buyer pursuant to the Transaction Documents shall be deemed to constitute reasonably

5    equivalent value and fair consideration under the Bankruptcy Code and under the laws of the

6    United States, any state, territory or possession.  Pursuant to Bankruptcy Rules 7062, 9014,

7    6004(h) and 6006(d), this Order shall be effective immediately upon entry and the Seller and

8    Buyer are authorized to close the Sale immediately upon entry of this Order.  As requested by

9    Debtor in its Sale Motion, the 10-day stay provision for this Sale Order under Federal Rule of

10    Bankruptcy Procedure Interim Rule 6004(h) is hereby waived and this Sale Order shall be

11    effective for all purposes as of the date of its entry.

12        18.    The Debtor is authorized, but not directed, to pay, at or prior to Closing, certain

13    real property and ad valorem tax claims asserted against the Debtor that have given, or may give,

14    rise to Liens with respect to the Purchased Assets.

15        19.    Nothing in this Order or the Transaction Documents approves or provides for the

16    transfer to Buyer of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or

17    otherwise) of the Debtor's estate.

18        20.    No bulk sales law or any similar law of any state or other jurisdiction applies in

19    any way to the Sale.

20        21.    The Debtor is authorized, but not directed, to pay, at or prior to Closing, certain

21    commissions payable to the brokers as set forth in the Transaction Documents.

22        22.    The failure specifically to include any particular provision of the Transaction

23    Documents in this Order shall not diminish or impair the effectiveness of such provision, it being

24    the intent of the Court that the Transaction Documents be authorized and approved in its entirety.

25        23.    The Transaction Documents and any related agreements, documents or other

26    instruments may be modified, amended or supplemented by the parties thereto and in accordance

27    with the terms thereof, without further order of the Court, provided that any such modification,

28    amendment or supplement does not have a material adverse effect on the Debtor's estate.

BN 18891974V1    11

24.    The Transaction Documents and the transactions and instruments contemplated thereby shall be specifically enforceable against and binding upon, and not subject to rejection or avoidance by, the Seller or any trustee of the Seller and its applicable estate.

25.    To the extent applicable, notwithstanding section 363(f) of the Bankruptcy Code, Buyer's purchase of any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), Buyer shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent Buyer would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under section 363 of the Bankruptcy Code.

26.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Transaction Documents, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Seller is a party or which will be assigned by the Seller to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

27.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.    To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in this chapter 11 case, the terms of this Order shall govern.  To the extent the terms of this Order are inconsistent with the terms of the Transaction Documents agreed to by the parties, the terms of the Transaction Documents shall govern.  The provisions of this Order are non-severable and mutually dependent.

29.    At the Closing, the Debtor is hereby authorized and directed to pay to U.S. Bank N.A., as successor to the Federal Deposit Insurance Corporation, as Receiver for California National Bank (the "Senior Lender"), the amount of the Purchase Price (as such term is defined in the Purchase Agreement) paid by the Buyer to the Debtor, as consideration for the sale by the

BN 18891974V1

12

1    Debtor to the Buyer of the Purchased Assets (such amounts, the "Sale Proceeds").  The Senior

2    Lender shall apply the Sale Proceeds to the outstanding obligations owing to the Senior Lender

3    under the applicable loan agreements.  The Sale Proceeds shall be paid to the Senior Lender by

4    depositing such amounts directly into an account or accounts to be specified by the Senior

5    Lender.

6                                            # # #

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER PURSUANT TO 11 U.S.C. §§ 105(A) 363 AND 365, AND FED. R. BANKR. P. 2002, 6004 AND 6006: (I) APPROVING
SALE OF CERTAIN ASSETS OF THE DEBTOR TO BUYER AND (III) GRANTING RELATED RELIEF

**EXHIBIT A**


**PURCHASE AND SALE AGREEMENT**

**EXHIBIT C**

**GRANT DEED**

**RECORDING REQUESTED BY
AND WHEN RECORDED, MAIL TO:**

_____
_____
_____
_____

**MAIL AND SEND TAX STATEMENTS TO:**

_____
_____
_____
_____

APN: _____

_____

Documentary Transfer Tax is $_____

(X)   computed on full value of property conveyed.
( )   computed on full value less value of liens and
       encumbrances remaining.

(X )   Unincorporated area: ( ) City of: _____

City transfer tax is $_____

Signature of declarant:


_____

**GRANT DEED**

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
Malibu Associates, LLC, a California limited liability company ("Grantor") hereby grants to
_____, a _____ ("Grantee"), all that certain real property
located in the County of Los Angeles, State of California as more particularly described on
Exhibit 1 attached hereto and incorporated herein by this reference.

[Signature on Next Page]

1

MAIL TAX STATEMENTS TO:  SAME AS ABOVE

IN WITNESS WHEREOF, this Grantor has executed this Grant Deed as of
_____, 2015.

<u>GRANTOR</u>:

MALIBU ASSOCIATES, LLC,
a California limited liability company

By:    The Thomas C. Hix Company No. 3, Inc.,
       a California corporation,
       a Managing Member


       By:    _____
            Thomas C. Hix,
            President

By:    MPK Development, LLC,
       a California limited liability company,
       a Managing Member


       By:    _____
            Mark D. Kvamme,
            Managing Member

2

MAIL TAX STATEMENTS TO:  SAME AS ABOVE

## EXHIBIT 1

### LEGAL DESCRIPTION

ALL THAT CERTAIN REAL PROPERTY LOCATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

[TITLE COMPANY TO ADD AND APPROVE]

A notary public or other officer completing this certificate verifies only the identity of the
individual who signed the document to which this certificate is attached, and not the truthfulness,
accuracy, or validity of that document.

STATE OF CALIFORNIA       )
                              ) ss.
COUNTY OF                 )

       On _____, 2015, before me, _____, Notary Public,
personally appeared _____ who proved to me on the basis of
satisfactory evidence to be the person whose name is subscribed to the within instrument and
acknowledged to me that he/she executed the same in his/her authorized capacity, and that by
his/her signature on the instrument the person, or the entity upon behalf of which the person
acted, executed the instrument.

       I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

       WITNESS my hand and official seal.

_____
Notary Public

4

# EXHIBIT D

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION is made the ___ day of_____, 2015, by and between Malibu Associates, LLC, ("Seller"), and _____, a _____ ("Buyer").

Reference is made to that certain Purchase and Sale Agreement dated as of April __, 2015 (the "Purchase Agreement"), by and between _____, a _____, and Malibu Associates, LLC, a California limited liability company, the rights of _____ having been assigned in accordance with the Purchase Agreement to Buyer. Capitalized terms used in this instrument without definition shall have the meanings given to them in the Purchase Agreement.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, intending to be legally bound, the parties hereto hereby agree as follows:

1.      Seller hereby sells, transfers, assigns and conveys to Buyer, the following:

(a)      All tangible personal property, equipment, supplies and fixtures owned by Seller and used in the operation of, and located at, the Real Property as of the Closing Date (collectively, the "Tangible Personal Property"), if any;

(b)      To the extent assignable, all of Seller's interest in any intangible personal property, contract rights, warranties, guaranties, licenses, permits, entitlements, governmental approvals and certificates of occupancy which relate to and/or benefit the Real Property (the "Intangible Personal Property" and, together with the Tangible Personal Property, the "Personal Property");

(c)      The Assigned Contracts listed on Exhibit 1 attached hereto and made a part hereof; and

(d)      Seller's interest in the name "Malibu Institute" and any and all trademarks or copyrights associated with said name.

Such sale, transfer, assignment and conveyance expressly excludes Seller's interest in any (i) cash, bank or other deposit accounts, (ii) refunds of prepaid expenses including, without limitation, insurance premiums, (ii) tax refunds for periods prior to Closing, and (iv) all insurance and other claims arising prior to the Effective Date; and

2.      Seller hereby agrees to indemnify, defend, and hold Buyer free and harmless from any cost, liability, damage or expense (including attorneys' fees) arising out of or relating to Seller's failure to perform any of the obligations of Seller under the Assigned Contracts, to the extent performance was required to be completed, or an obligation to pay fully accrued, prior to the date hereof. Buyer hereby agrees to indemnify, defend, and hold Seller free and harmless from any cost, liability, damage or expense (including attorneys' fees) arising out of or relating

1

to Buyer's failure to perform any of the obligations of Buyer under the Assigned Contracts, to the extent accruing from and after the date hereof.

3.     Seller makes no warranties or representations hereunder of any kind, express or implied, with respect to the property or rights being conveyed and assigned to Buyer; Buyer has not relied upon and will not rely upon any representation or warranty of Seller; Seller is conveying such property and rights to Buyer and Buyer hereby accepts the same "as is, where is" with all faults; and there are no oral agreements, warranties or representations, collateral to or affecting such property made by Seller or any third party.

4.     Assignee hereby accepts the foregoing assignment on the terms set forth in this Bill of Sale, Assignment and Assumption.

5.     This Bill of Sale, Assignment and Assumption may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

6.     This Bill of Sale and Assignment shall be governed by laws of the State of California, without regard to principles of conflicts of laws.

[Signatures on Next Page]

2

IN WITNESS WHEREOF, the undersigned have executed and delivered this Bill of Sale and Assignment as of _____, 2015.

SELLER:

MALIBU ASSOCIATES, LLC,
a California limited liability company

By:    The Thomas C. Hix Company No. 3, Inc.,
       a California corporation,
       a Managing Member


       By:    _____
              Thomas C. Hix,
              President

By:    MPK Development, LLC,
       a California limited liability company,
       a Managing Member


       By:    _____
              Mark D. Kvamme,
              Managing Member

3

**EXHIBIT E**

**UNITE HERE LOCAL 11 MEMORANDUM OF AGREEMENT**

1

<u>Memorandum of Agreement</u>

1. This Agreement is made this 20th day of February 2015, by and between Malibu Associates,
LLC, a California limited liability company ( "collectively the "Developers") and UNITE HERE
Local 11 ("the Union"). "Developer" shall be deemed to include any person, firm, partnership,
corporation, joint venture or other legal entity substantially under the control of the Developer covered
by this Agreement, or one or more principal(s) of the Developer covered by this Agreement or a
subsidiary of the Developer covered by this Agreement, or any person, firm, partnership, corporation,
joint venture or other legal entity which substantially controls the Developer covered by this
Agreement. Developers are engaged in the development of a hotel, restaurants and golf course in Los
Angeles County called the Malibu Institute and located near 901 Encinal Canyon Rd, Malibu, CA
90265. The hotel ("Hotel"), surrounding restaurants and other food service ("Restaurants"), and golf
course (Golf Course") are a "Project". Collectively the Hotels, Restaurants, and Golf Course are "the
Operations". Many jobs will be created in the process. These jobs include permanent positions for
food and beverage workers, hotel service workers, landscapers and other golf course maintenance
workers in the Operations. The Union is interested in organizing the Employees of the Operations.
"Employees" means all regular full-time and regular part-time bungalow/hotel service, housekeeping,
food and beverage, golf course, laundry personnel (including room cleaners, housepersons, bell and/or
door persons, telephone operators, kitchen and/or culinary employees, servers, bussers, bartenders,
cashiers, hosts, concierges, landscapers, maintenance, **combined golf course
maintenance/landscaper classifications, spa cleaners,** and front desk employees) personnel
employed by an Operator at the Project, but does not include specialized elevator or electrical
contractors, **spa professionals, specialized spa maintenance, spa attendants,** parking employees,
office clerical employees, retail, sales, golf professionals, guards, or managerial or professional
employees as defined under the National Labor Relations Act. "Operator" means any person, firm,
proprietorship, partnership, corporation, joint venture or other form of business organization which
has or acquires any right to operate an Operation at the Project, including the Developer itself if it
operates an Operation at the Project.

2. In consideration for Developer's covenants made herein, the Union promises and covenants
for itself and on behalf of its members that it will not engage in any strike, picketing, or boycott with
respect to the Project as a whole or with respect to any Operation of said Project, provided that this
promise shall terminate immediately and without notice with respect to any unit of Employees in such
an Operation upon:

(a) recognition of any union other than the Union signatory to this Agreement as the exclusive
collective bargaining representative for the Employees in that unit or any part of it; or

(b) expiration of a collective bargaining agreement between an Operator and the Union for that
unit.

The Union and the Developer will not file any charges with the National Labor Relations Board
or commence any other action in law or equity in connection with any act or omission occurring within
the context of this agreement; arbitration under this Agreement shall be the exclusive remedy. The
Union further promises and covenants that it will use its best efforts to promote the development of the
Project to all pertinent public bodies and officials, **including future expansions of the project that
are considered by public bodies and officials during the term of this agreement.** Upon Developer's
request, the Union will work together with Developer to develop communications materials describing
the Project and its benefits to food and beverage, hotel service, and golf course workers and to the
community.

3. Developer shall facilitate the recruitment and training of employees by the Operators by making a contribution to the HTA of $50,000.00 (the "HTA Contribution") to be paid in two equal installments. The first installment shall be paid upon the commencement of construction of the Hotel. The second installment shall be paid 90 days prior to the hiring of the first employees in the Project.

4. (a) Developer shall give the Union written notice of any existing or future purchase and sale contract, lease, sublease, management agreement, subcontract, operating agreement, franchise agreement or any other agreement or instrument disposing any interest in a Project or allowing an employer to conduct an Operation at the Project, and it shall inform this Union in writing of the identity and contact information of any Operator. Developer shall incorporate the entirety of subsections (b), (c), (d), (e), (f), (g), (h) and (i) of section 4 of this Memorandum of Agreement in any existing or future purchase and sale contract, lease, sublease, management agreement, subcontract, operating agreement, franchise agreement or any other agreement or instrument disposing any interest in a Project or allowing an employer to conduct an Operation at the Project, and shall obligate any person who has taken or takes such interest, and any and all successors and assigns of such person, to in turn incorporate said subsections in any further purchase and sale contract, lease, sublease, operating agreement, franchise agreement, subcontract or any other agreement or instrument disposing any interest in the Project or allowing an employer to conduct an Operation at the Project. Developer shall enforce such provisions, or at its option, assign its rights to do so, to the Union. The terms "Operator," "Operation," and "Project" shall be modified in each such agreement or instrument to conform to the terminology in such agreement or instrument but retain the same meaning as in this Agreement. The Developer shall provide to the Union, upon request, copies of those portions of any such agreement or instrument showing the parties thereto and that it has been duly executed, the effective date(s) and term(s), and that the provisions required by this Agreement have been included therein.

(b)      The Operator shall work with the Hospitality Training Academy ("HTA") when recruiting for its initial complement of employees to staff the Operations upon opening or thereafter when filling vacancies in job classifications covered by this Agreement. The HTA is jointly sponsored by Local 11 and hospitality industry employers in Southern California and provides training to new entrants to the industry.

(c)      The Operator will give priority consideration for employment to applicants who have previously worked at the location of the Project. The Operator will make its best efforts, through its work with the HTA to offer employment opportunities to qualified candidates that live in the the Santa Monica Malibu Unified School District (SMMUSD) and students from Santa Monica College (SMC). The Operator will make at least one (1) paid internship available per school session (for example per semester) to qualified "Opportunity Youth" (as defined by the City of Santa Monica and referred for employment from the HTA) to enable the intern to obtain valuable job training skills and work experience. Operator shall notify the HTA to request referral of applicants for all such initial-complement positions and subsequent vacancies. When requesting applicants from the HTA, the Operator shall state the qualifications applicants are expected to possess. The Operator shall be the sole judge of an applicant's suitability, competence and qualifications to perform the work of any job to be filled. After initially screening such applicants, the HTA shall present them to Operator for initial consideration. Those of the applicants presented by Local 11 which are approved by Operator for training shall be enrolled into the HTA along with applicants from other sources who Operator may refer for training in the HTA. The HTA, in conjunction with Operator, shall develop a curriculum specifically designed to provide training tailored to the needs of Operator. The Operator shall give

preference in hiring to applicants who have completed successfully an HTA training program employing standards agreed to between HTA and the Operator. Neither Local 11 nor the HTA will be obligated to present or train for applicants once they have presented a number of qualified applicants willing to accept employment with the Operator equal in number to the positions available at the full public opening of the Hotel. Local 11's selection of applicants for referral shall be on a non-discriminatory basis and shall not be based upon or in any way affected by membership in the Union or the Union's bylaws, rules, regulations, constitutional provisions, or any other aspects or obligation of Union membership policies or requirements, or upon personal characteristics of an applicant where discrimination based upon such characteristics is prohibited by law. Similarly, Operator agrees that any interest demonstrated by an applicant in joining the Union shall not constitute grounds for discriminatory or disparate treatment, nor adversely impact the applicant's ability to be hired by the Operator.

(d)     The duly authorized representatives of the Union seeking to communicate with Employees of the Operator shall be permitted to enter upon the premises of the Project for that purpose, provided that such representatives shall only communicate with Employees on the Employees' non-work time and in places that are non-work areas for them and shall not interfere with the orderly operations conducted by the Operator.

(e)     Within ten (10) days following receipt from the Union of written notice of intent to organize a bargaining unit consisting of Employees of an Operator at the Project (or such other unit as the parties may agree), the Operator shall furnish the Union with a complete list of Employees in the unit showing their place of employment, job classification, departments, home addresses, and if known by the Operator, email addresses and telephone numbers. Thereafter, the Operator shall provide updated complete lists monthly.

(f)     The Operator will take a neutral approach to the unionization of Employees. The Operator shall not take any action or make any statement that will directly or indirectly state or imply the Operator's opposition to or support for the selection by Employees of a collective bargaining representative, or preference for or opposition to any particular union as a bargaining agent.

(g)     If at any time starting six (6) months after of the full public opening of the hotel the Union requests recognition as the exclusive collective bargaining agent for Employees in the appropriate unit defined above, the arbitrator identified in paragraph (i), or another person mutually acceptable to the Operator and the Union, will conduct a review of employees' authorization cards submitted by the Union in support of its claim to represent a majority of such employees. If that review establishes that a majority of such employees has designated the Union as their exclusive collective bargaining representative, the Operator will recognize the Union as such representative of such employees. The Operator will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this agreement. The Union and the Operator agree that if any other person or entity petitions the National Labor Relations Board for any election as a result of or despite recognition of the Union pursuant to this Paragraph, then (a) the Operator and the Union will each request that the NLRB dismiss the petition on grounds of recognition bar or, if they have agreed to a collective bargaining agreement covering Employees at the time the petition is filed, on grounds of contract bar, (b) if the petition is not dismissed, the Operator and the Union shall agree to a full consent election agreement under Section 102.62(c) of the NLRB's Rules and Regulations, and (c) the Operator and the Union shall at all times abide by the provisions of this Agreement except that the Union may file unfair labor practice charges. Except as provided above,





the Union and the Operator will not file any charges with the National Labor Relations Board in connection with any act or omission occurring within the context of this agreement; arbitration under Paragraph (i) shall be the exclusive remedy.

(h)    If the Union is recognized as the exclusive collective bargaining representative as provided in this subsection, negotiations for a collective bargaining agreement shall be commenced immediately and conducted diligently and in good faith to the end of reaching agreement expeditiously. If the Union and Operator are unable to reach agreement on a collective bargaining agreement within six (6) months after recognition pursuant to paragraph (e), all unresolved issues shall be submitted for resolution to final and binding arbitration pursuant to paragraph (i) below. The arbitrator identified in paragraph (i) shall be the arbitrator, unless another arbitrator is mutually agreed to by the parties. The arbitrator shall be guided by any relevant facts or arguments advanced by either party in support of their position. This subsection shall apply only to the first collective bargaining agreement and not to any successor or replacement agreements.

(i)    The parties agree that any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration, with Fred Horowitz serving as the arbitrator. If he is unavailable to serve within thirty (30) calendar days of notification then Louis Zigman or another mutually-acceptable person, shall be the arbitrator. The arbitrator shall have the authority to determine the arbitration procedures to be followed. The parties hereto agree to comply with any order of the arbitrator, which shall be final and binding. The U.S. District Court where the Project is located shall have jurisdiction over any litigation related to arbitration under this Agreement and shall have authority to enter preliminary equitable relief to preserve the efficacy of an arbitral remedy, and without posting of bond. The parties consent to the entry of any order of the arbitrator as the order or judgment of the court, without entry of findings of fact and conclusions of law. Any party unsuccessfully and without substantial justification refusing to arbitrate or to comply with an arbitral award, or assisting any person in challenging any provision of this Agreement, shall be liable for the other party's attorneys fees in addition to all other damages.

4.    This Agreement shall be in full force and effect with respect to each Operation from the date it is fully executed on behalf of the Developer and the Union until three years from the full public opening of the Operations.

5.    In the event that the Developer sells, transfers, or assigns all or any part of its right, title, or interest in a Project or substantially all of the assets used in the operation of a Project, or in the event there is a change in the form of ownership of the Developer, the Developer shall give the Union reasonable advance notice thereof in writing, and the Developer further agrees that as a condition to any such sale, assignment, or transfer, the Developer will obtain from its successor or successors in interest a written assumption of this Agreement and furnish a copy thereof to the Union, in which event the assignor shall be relieved of its obligations hereunder to the extent that the assignor has fully transferred its right, title, or interest.

6.    The provisions of section 4(b)-(i) of this Agreement may be modified in a bona fide agreement between an Operator and the Union, but only if the modification is explicitly set forth in such agreement in clear and unambiguous terms.

7.    Any disputes over the interpretation or application of this Agreement shall be submitted to expedited and binding arbitration pursuant to the procedure in paragraph 4(i).



Malibu Associates, LLC [Developer]

By: _____
Thomas Hix, President of The Thomas C. Hix **Company No. 3, Inc**

**Its: Managing Member**

**Date: February 20th, 2015**


**UNITE HERE Local 11**

By: _____

Its: PRESIDENT

Date: 2/20/15

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing documents described as **NOTICE OF MOTION AND MOTION FOR ORDER ESTABLISHING BIDDING PROCEDURES FOR SALE OF DEBTOR'S PROPERTY FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS PURSUANT TO 11 U.S.C. §§ 105 AND 363; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF THOMAS C. HIX IN SUPPORT THEREOF** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On September 11, 2015, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Cristina E Bautista on behalf of Creditor U.S. Bank National Association, as successor-in-interest to the Federal Deposit Insurance Corporation
cristina.bautista@kattenlaw.com, ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com

Cristina E Bautista on behalf of Defendant U.S. Bank National Association, as successor-in-interest to the Federal Deposit Insurance Corporation, as receiver for California National Bank
cristina.bautista@kattenlaw.com, ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com

Patrick M Costello on behalf of Interested Party Richard S Fuld
pcostello@vectislawgroup.com, clee@vectislawgroup.com

Brian D Fittipaldi on behalf of U.S. Trustee United States Trustee (ND)
brian.fittipaldi@usdoj.gov

Michelle S Grimberg on behalf of Plaintiff Malibu Associates, LLC, a California Limited Liability Company
msg@lnbyb.com, angela@lnbrb.com

Irving M Gross on behalf of Plaintiff Malibu Associates, LLC, a California Limited Liability Company
img@lnbrb.com, angela@lnbrb.com

Jessica Mickelsen Simon on behalf of Creditor U.S. Bank National Association, as successor-in-interest to the Federal Deposit Insurance Corporation
jessica.mickelsensimon@kattenlaw.com, adelle.shafer@kattenlaw.com;ecf.lax.docket@kattenlaw.com

David L. Neale on behalf of Debtor Malibu Associates, LLC, a California limited liability company
dln@lnbyb.com

David L. Neale on behalf of Plaintiff Malibu Associates, LLC, a California Limited Liability Company
dln@lnbyb.com

Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, nick@ronaldrichards.com

Lindsey L Smith on behalf of Debtor Malibu Associates, LLC, a California limited liability company
lls@lnbyb.com, lls@ecf.inforuptcy.com

Lindsey L Smith on behalf of Interested Party Courtesy NEF
lls@lnbyb.com, lls@ecf.inforuptcy.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                   **F 9013-3.1.PROOF.SERVICE**

United States Trustee (ND)
ustpregion16.nd.ecf@usdoj.gov

Joshua D Wayser on behalf of Creditor U.S. Bank National Association, as successor-in-interest to the Federal Deposit Insurance Corporation
joshua.wayser@kattenlaw.com,
jessica.mickelsen@kattenlaw.com;kim.johnson@kattenlaw.com,ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com

Joshua D Wayser on behalf of Defendant U.S. Bank National Association, as successor-in-interest to the Federal Deposit Insurance Corporation, as receiver for California National Bank
joshua.wayser@kattenlaw.com,
jessica.mickelsen@kattenlaw.com;kim.johnson@kattenlaw.com,ecf.lax.docket@kattenlaw.com,adelle.shafer@kattenlaw.com

**2. SERVED BY UNITED STATES MAIL**:
On September 11, 2015, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page re service

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 11, 2015, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

| Via Overnight Delivery<br>Mr. Matt Venturi<br>Venturi & Company<br>345 Lorton Ave #105<br>Burlingame, CA 94010 | Via Overnight Delivery<br>Brixton Capital AC, LLC<br>Attn: Travis King and Bob Emri<br>4435 Eastgate Mall, Suite 310<br>San Diego, CA 92121 | Via Overnight Delivery<br>Teel & Roeper, LLP<br>Attn: Dean E. Roeper, Esq.<br>And Shannon L. Haines, Esq.<br>11455 El Camino Real, Suite 300<br>San Diego, CA 92130 |
|---|---|---|
| Chambers Copy Via Overnight Delivery<br>Hon. Deborah J. Saltzman<br>United States Bankruptcy Court<br>Central District of California<br>255 East Temple St., Ste. 1334<br>Los Angeles, CA 90012 | Via Email<br>Dean E. Roeper, Esq.<br>droeper@teelroeper.com | Via Email<br>Shannon L. Haines, Esq.<br>shaines@teelroeper.com |

☐ Service information continued on attached page re service

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 11, 2015 | John Berwick | /s/ John Berwick |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**